**NG PUI YU, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19715.**

United States Court of Appeals
Ninth Circuit.
Oct. 20, 1965.

Michael Riordan, James C. Purcell, San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., Zeppelin W. Wong, Asst. U. S. Atty., for appellee.

Before JERTBERG and DUNIWAY, Circuit Judges, and FOLEY, District Judge.

ROGER D. FOLEY, District Judge.

We are met at the threshold with a motion by the Government to remand the case for proper judgment and sentence.

Appellant was convicted by a jury of violation of Title 21, U.S.C. § 174 and for conspiracy to violate the said section.

The trial judge sentenced Appellant to imprisonment for a period of two years as to each of Counts 13 and 15, to run concurrently, adjudging that the Appellant has been convicted upon his plea of not guilty and a verdict of guilty of the offense of violation of Title 26, U.S.C. § 4704—Conspiracy To Sell Narcotics Not From Stamped Package.

The Government would have us remand, contending that since Appellant was indicted under and convicted of a violation of Title 21, U.S.C. § 174, and since Appellant was not charged and convicted under 26 U.S.C. § 4704, the judgment and sentence is based on a non-existent verdict, so that there is no reviewable judgment or order before this Court.

The Judgment and Commitment is an appealable order under Rule 37, F.R.Cr.P., 28 U.S.C. Sections 1291 and 1294(1). We need not decide whether the Court below had the authority to sentence Appellant as it did. Should we reverse, the question is moot. If we affirm, the Government, after the mandate comes down, may move to correct the alleged illegal sentence under Rule 35, F.R. Cr.P.

We are next concerned with two questions:

First, whether or not the arresting officers had probable cause to arrest Appellant without a warrant.

Second, whether or not the entry by the officers into Appellant's dwelling place to execute the arrest and incidental search and seizure was proper.

The statement of facts set out in the Government's brief find ample support in the record and we therefore adopt the same, in part:

"On October 23, 1963, Customs Agent David C. Muegge received information from Customs Port Investigator Harlan Wong that 'Chinese crew members of the Norwegian motor ship "Hoegh Dene" would deliver a quantity of opium to appellant, Ng Pui Yu, who lived at 730 Jackson Street in San Francisco; that the narcotics would be smuggled ashore by each participating seaman concealing it in his rectal cavity.' Upon receipt of this information, Agent Muegge took steps to corroborate the facts received from the informant, for the Federal Agent had no prior knowledge that the information was reliable. In the course of his investigation, Agent Muegge learned from the Federal Bureau of Narcotics that one Ng Pui Yu had lived at 730 Jackson Street in Rooms 10 and 11, and had been convicted nine times for narcotic violations since 1933. The Agent further determined a vessel called the 'Hoegh Dene' was enroute to San Francisco with Chinese crew members; the Agent then compared the names of the Chinese crew members aboard the 'Hoegh Dene' with his intelligence files and found that his files contained the names of certain crew members.

"On the evening of October 26, 1963, the 'Hoegh Dene' docked at Pier 23 in San Francisco, and Customs Agents began a surveillance of the foreign crew members. A surveillance team observed several groups of Chinese crew-men leave the vessel at approximately 8:00 p. m. and walk from the Pier into Chinatown. Three of the crewmen entered 730 Jackson Street, stayed a few minutes and left. About 45 minutes later the same three Chinese crewmen returned to 730 Jackson Street, stayed a few minutes and left. At 10:00 p. m. the same three Chinese crewmen again entered 730 Jackson Street, stayed for approximately 20 minutes and then left. They walked up Jackson Street and went back to the vessel.

"The next day, October 27, 1963, Agent Muegge had 30 officers working with him on the case. He was monitoring radio transmissions from the various surveillance teams. At approximately 9:30 a. m., Chinese crewmen in separate groups were observed leaving the vessel 'Hoegh Dene' and departing the Pier. Physical descriptions of the crewmen and their movements were reported by one surveillance team to another. Four Chinese crewmen were observed walking to Chinatown and going into 730 Jackson Street. They were followed inside a few minutes later by two more Chinese crewmen; a few minutes later two more Chinese crewmen went into 730 Jackson Street. All remained inside for a few minutes. They all came out and then walked back to the vessel.

"At approximately 11:00 a. m. a surveillance team observed appellant, Ng Pui Yu, leave 730 Jackson Street, go to 20 Beckett Alley, come back out to Jackson Street, speak to an unidentified man and then return to 730 Jackson Street. At approximately 12:45 p. m., surveillance teams observed three Chinese crewmen leave the 'Hoegh Dene,' walk toward Chinatown, and enter 730 Jackson Street. As the three crewmen approached 730 Jackson Street, another group of three Chinese crewmen left the 'Hoegh Dene.' The latter three, Cheung Hung Yan, Cheung Yuk Hi and Kwok Yu Chi, were stopped by Customs Agents who identified themselves and told the seamen in English and Chinese that they wished to search them. The

crewmen were taken into an unoccupied premise at 99 Broadway.

"The Agents advised these crewmen that they were suspected of carrying narcotics and asked them to deliver the contraband. Thereupon Cheung Yuk Hi and Kwok Yu Chi delivered containers of suspected opium which each had concealed in his rectal cavity. When the Agents at 99 Broadway had obtained suspected opium, they advised the other surveillance officers of this information by radio. By this time the first group of three Chinese crewmen had gone inside 730 Jackson Street. The information that suspected narcotics had been found was communicated over the radio to other officers who were in the vicinity of 730 Jackson Street. The officers then entered 730 Jackson Street and proceeded towards Rooms 10 and 11 for the purpose of arresting appellant. [The agents had neither arrest nor search warrants.]

"Customs Agent Milton K. Wu was one of the lead group of Agents who were to arrest Ng Pui Yu at 730 Jackson Street. Advised of all the previous day's activities, the activities on this day and the information transmitted over the radio from the Agents from 99 Broadway, Agent Wu met the other Agents inside the building. The Agents gathered in the hallway in front of Rooms 10 and 11 at 730 Jackson Street. They were about to make the arrest. Customs Agent Niblo was standing directly in front of the door to Room 10. Before any action was taken by the Federal Agents either to knock or otherwise announce themselves, the door to Room 10 was opened from the inside by appellant, Ng Pui Yu. The door swung inward and appellant looked as if he was going to take a step forward. When he saw the Agents at the door, he stepped backward. Agent Niblo entered Room 10. Appellant retreated. One of the seamen inside Room 10 grabbed Agent Niblo around the neck. At the same time, Agent Wu said in a very loud voice that they were Federal Agents and that the people in the room were under arrest. The appellant made no attempt to close the door.

"Agent Wu recognized two Chinese crewmen from the 'Hoegh Dene,' Ng Chun Wan and Liu Tin Hing, in the room. Immediately thereafter, Agent Wu saw Agent Niblo walk appellant away. Where the appellant had been standing, Agent Wu retrieved contraband opium, Government Exhibit 3. Agent Wu searched further and seized more contraband opium in the room, Government Exhibits 4 and 6."

In its statement of facts, the Government neglected to indicate that Customs Agent Milton K. Wu, who participated in the arrest of Appellant, was in possession of all of the pertinent information known to Customs Agent David C. Muegge (see Reporter's Transcript, Motion to Suppress, Pages 53 et seq.).

Appellant urges that there was no probable cause for his arrest without a warrant and therefore the search and seizure of Exhibits 3, 4 and 6 were not incident to a lawful arrest and the trial court should have granted Appellant's motion to suppress the evidence seized in Room 10 at 730 Jackson Street in San Francisco.

The Fourth Amendment to the United States Constitution enjoins unreasonable search and seizure.[1]

26 U.S.C. § 7607 provides, in pertinent part, that the Commissioner and Agents of the Bureau of Narcotics may—

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Fourth Amendment, Constitution of the United States.

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs * * * where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

Both the Appellant and the Government cite Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. At page 313, 79 S.Ct. at page 333 the Supreme Court states:

" 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, supra, 338 U.S. at page 175, 69 S.Ct. at page 1310. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves

to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288 [69 L.Ed. 543]."

In Wong Sun v. United States, 371 U.S. 471, at page 479, 83 S.Ct. 407, at page 413, 9 L.Ed.2d 441, we find this language:

" * * * The quantum of information which constitutes probable cause —evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, Carroll v. United States, 267 U. S. 132, 162, 45 S.Ct. 280, 288, 69 L. Ed. 543—must be measured by the facts of the particular case."

■ "Reasonable grounds", as used in 26 U.S.C. § 7607, and "probable cause", as used in the Fourth Amendment, "are substantial equivalents of the same meaning." Draper v. United States, supra.

■ The search of Cheung Hung Yan, Cheung Yuk Hi and Kwok Yu Chi was a border search.[2]

■ The right of border search does not depend upon probable cause.[3]

2. 19 U.S.C. § 482 reads, in part:
"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

3. " 'Carroll v. United States, 1924, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543. Cf.: People v. Brown, 1955, 45 Cal.2d 640, 290 P.2d 528; Johnson v. United States, 1948, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92 L. Ed. 436; People v. Simon, 1955, 45 Cal. 2d 645, 290 P.2d 531. "[The] searches of persons entering the United States from a foreign country are in a separate category from searches generally * * * [and] 'are totally different things from a search for and seizure of a man's private books and papers * * *.' " King v. United States, 5 Cir., 1958, 258 F.2d 754, at Page 756, certiorari denied 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639, quoting Boyd v. United States, 1886, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746. Cf.: Blackford v. United States, 9 Cir., 1957, 247 F.2d 745, certiorari denied 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586; United States v. Yee Ngee How, D.C.N.D.Cal., 1952, 105 F.Supp. 517.' " King v. United States, 9 Cir., 1965, 348 F.2d 814 at 817–818.

In determining whether or not there was probable cause to arrest Appellant without a warrant, we must consider the arresting officers' knowledge of the seizure of the contraband opium from the three crew members at 99 Broadway.

At the time of the arrest of Appellant, at least one of the arresting officers, Milton K. Wu, had the following information:

1. Appellant lived at 730 Jackson Street, San Francisco, in Rooms 10–11.

2. Appellant had been convicted nine (9) times for narcotic violations since 1933.

3. The Hoegh Dene was enroute to San Francisco with Chinese crew members.

4. Customs Agents' files contained the names of some of the crewmen.

5. On October 26, at approximately 8:00 p. m., three Chinese crew members entered 730 Jackson Street, remained for a few minutes and then left.

6. At about 8:45 p. m., the same three crew members re-entered 730 Jackson Street, and after a short time, left again.

7. At about 10:00 p. m., the same three crew members re-entered 730 Jackson Street, remained about twenty minutes, came out and returned to the vessel.

8. On October 27, at about 9:30 a. m., four crew members from the vessel entered 730 Jackson Street.

9. A few minutes later, two more crew members from the vessel entered 730 Jackson Street.

10. A few minutes later, two more of the Chinese crewmen entered 730 Jackson Street.

11. All of the crew members described in Paragraphs 8, 9 and 10 remained inside for a few minutes, came out and returned to the ship.

12. At about 12:45 p. m., three crew members left the ship and entered 730 Jackson Street. As these three crew members approached 730 Jackson Street, another group of three Chinese crewmen left the vessel. These last three were stopped and searched and two of them handed over suspected opium.

■ It is not required that probable cause be established solely by facts within the personal knowledge of the arresting officer. A combination of information and personal knowledge may raise the inference beyond opinion, suspicion, and conjecture to reasonable probability. All information in the agent's possession, fair inferences therefrom, and observations made by him are pertinent. United States v. Kancso, 252 F.2d 220 (CA2 1958).

■ We hold that under the circumstances of this case, the arresting officers had probable cause for executing the arrest of Appellant without a warrant.

Appellant next contends that the entry of the officers into Room 10 of 730 Jackson violated 18 U.S.C. § 3109, since the officers entered without notice of their authority and purpose and had not been refused admission.

18 U.S.C. § 3109 reads:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

■ While 18 U.S.C. § 3109 expressly relates to the circumstances under which an officer may break into a house to execute a search warrant, validity of an entry to execute and arrest without a warrant must be tested by criteria identical with those embodied in 18 U.S.C. § 3109. Miller v. United States, 357 U.S. 301, 309, 78 S.Ct. 1190, 2 L.Ed.2d 1332; Dickey v. United States, 9 Cir., 1964, 332 F.2d 773, 777.

Appellant relies upon Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126, 1960, which held that the word "break", as used in 18 U.S.C. § 3109, means to enter without permission.

We think that Court misreads Miller v. United States, supra. Miller holds that the arresting officers violated 18 U.S.C. § 3109 when they forced open the door of an apartment by breaking the chain lock securing the same, entered, and made the arrest without a warrant without first giving notice of their authority and purpose for seeking admission. There is no language in Miller supporting the position of the court in Keiningham, that the entry must be by consent when the door is open. We note that 357 U.S. at page 308, 78 S.Ct. at page 1195, the Supreme Court, in Miller, quoted as follows from an English decision:

"Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the breaking was unlawful where the officer failed first to state his authority and purpose for demanding admission. The requirement was pronounced in 1603 in Semayne's Case, 5 Coke Co.Rep. 91a, 11 E.R.C. 629, 77 Eng.Repr. 194, at 195: 'In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors * * *.*' (Emphasis supplied.)

"The requirement stated in Semayne's Case still obtains. It is reflected in 18 U.S.C. § 3109, 18 U.S. C.A. § 3109, in the statutes of a large number of States, and in the American Law Institute's proposed Code of Criminal Procedure, § 28. It applies, as the Government here concedes, whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant."

In Dickey v. United States, supra, this Court held that where the officers successfully employed a ruse to induce the occupant to open the door and then entered through the open door and arrested the occupant, a search and seizure incident to the arrest was proper.

The decision of the Court of Appeals for the District of Columbia in an earlier case, Ellison v. United States, 93 U.S. App.D.C. 1, 206 F.2d 476, 1953, and two decisions of the United States District Court for the District of Columbia, United States v. Bowman, 137 F.Supp. 385, and United States v. Silverman, 166 F. Supp. 838, are in agreement with the position we take.

■ We hold that Appellant's consent to the entry was not required and the entry made through the open door was not made in violation of 18 U.S.C. § 3109.

The motion to suppress was correctly denied and the narcotics Exhibits 3, 4 and 6, in evidence, found in Appellant's rooms, were properly received.

■ The Appellant and fourteen alien crew members of the Hoegh Dene were indicted for violation of 21 U.S.C. § 174. All defendants pled not guilty. Subsequently, a superseding information was filed charging the fourteen crew members with a lesser offense. These defendants entered pleas of guilty to the superseding information. They were each given a sentence of two years in prison. Execution of the sentences were suspended and they were placed on probation and deported.

Relying upon Schneider v. Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218, which held that a different rule could not be applied to naturalized citizens than that applicable to native-born citizens, Appellant argues that the different treatment given the fourteen alien Chinese crewmen offended his constitutional right to due process of law.

Appellant argues that he was charged and convicted for violating 21 U.S.C. §

174 (although sentenced under 26 U.S.C. § 4704, see supra) and the aliens could have been prosecuted under 21 U.S.C. § 191.[4]

Appellant cites no cases holding that prosecution of an alien for certain prescribed conduct carrying a misdemeanor penalty precludes prosecution of citizens of the United States for the same conduct, under a statute, violation of which is a felony.

In any event, the aliens were charged in a superseding information and sentenced to two years in prison. Therefore, they were not convicted and sentenced under 21 U.S.C. § 191, as violation of this statute is a misdemeanor. This contention of Appellant is likewise without merit.

■ Finally, Appellant argues that he could not be guilty of conspiracy under Count 15, since he cannot be the sole conspirator, the indictment against the other named co-conspirators, the fourteen alien crew members having been dismissed after they pled guilty to a superseding information.

This Court, just recently in Mendez v. United States, August 16, 1965, 349 F.2d 650, stated:

"Appellant's counsel makes no contention that appellant was not properly convicted on the charges contained in Counts One and Three of the indictment. He contends, however, that his conviction on Count Two should be set aside since he alleges that the charge in Count Two is identical with the charge in Count One. We do not reach the merits of this contention, since the sentences imposed upon all three counts were identical and were ordered to run concurrently with each other. Winger v. United States, 233 F.2d 440 (9th Cir. 1956); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1957); Byrnes v. United States, 327 F.2d 825 (9th Cir. 1964); King v. United States, 279 F.2d 342 (9th Cir. 1960)."

We could dispose of Appellant's contention in like manner. However, since there is the possibility that after the mandate comes down the sentences heretofore imposed might be vacated and new sentences imposed and made to run consecutively, we should decide this question on the merits.

The fact that the fourteen crew members originally charged with Appellant in Count 15 of the Indictment as co-conspirators were dismissed does not, of itself, give Appellant any basis of complaint.

■ It is not necessary, to sustain a conviction for a conspiracy, that co-conspirators be charged. Cf. Miller v. United States, 2 Cir., 24 F.2d 353, 361, cert. den. 276 U.S. 638, 48 S.Ct. 421, 72 L.Ed. 745. United States v. Gordon, 242 F.2d 122, 3 Cir., cert. den. 354 U.S. 921, 77 S.Ct. 1378, 1 L.Ed.2d 1436.

Affirmed.

DUNIWAY, Circuit Judge.

I concur. However, I do not think it necessary in this case to decide whether the decision of this court in Dickey v. United States, 1964, 332 F.2d 773 and that of the Court of Appeals for the District of Columbia Circuit in Keiningham v. United States, 109 U.S.App.D.C. 272, 1960, 287 F.2d 126 are in conflict. Here, as I see it, there was compliance with 18 U.S.C. § 3109. Agent Wu's announcement in a loud voice, that "we were federal officers; that they were under arrest" was all that the section requires. He testified "You have to understand this happened in a very split second." He made the announcement "As I was going

4. "The importation of opium into any of the ports of the United States by any subject of the Emperor of China is prohibited.

"Every person guilty of a violation of the preceding provision shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not more than $500 nor less than $50, or by imprisonment for a period of not more than six months nor less than thirty days, or by both such fine and imprisonment, in the discretion of the court." 21 U.S.C. § 191.

into the room." The required announcement was made; the door had already been opened. There was no need for the officers to wait for the occupant to open it. I think that, whatever the purpose of the section 3109 requirement, it was satisfied here.