**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph Baldamar CISNEROS, Defendant-Appellant.**

**No. 26115.**

United States Court of Appeals, Ninth Circuit.

Sept. 1, 1971.

Carl E. Stewart (argued), Hollywood, Cal., for defendant-appellant.

John W. Hornbeck, Asst. U. S. Atty. (argued), Robert L. Meyer, U. S. Atty., David R. Nissen, Chief, Crim. Div., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, MERRILL and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This is an appeal from a judgment of conviction in a nonjury trial in which the defendant, Joe Cisneros, was found guilty of two counts of violating 21 U.S.C. § 174, and one count of violating 26 U.S.C. § 4705(a) as a result of his participation in a sale of 30.02 grams of heroin on May 12, 1969. Our jurisdiction rests upon 28 U.S.C. § 1291.

Carol Thomas, a co-participant in this transaction, had made two previous sales of heroin to government agents, but she was never aware that she was doing business with agents of the Federal Bureau of Narcotics. Agent Ozment, in an effort to reach her source of supply, contacted Thomas regarding yet another purchase of narcotics. She told Ozment that her connection, whose name was Joe, had some heroin for sale. Agents Ozment and Herring, to consummate the sale, were to pick up Thomas, take her to meet her connection at his location, where she could obtain the narcotics, and make the purchase from her. R.T. 48. The agents met Thomas, and she directed them to the vicinity of a house on Spreckles Street, Redondo Beach, California, an area that had been the approximate location of one of the two prior sales made by Thomas. The house on Spreckles Street was owned by the father of Cisneros' girlfriend, Helen Montanez.

Before the appointment with Carol Thomas all of the agents met together and reviewed their respective assignments. There were three separate vehicles and six agents all in communication with each other by two-way radio. The agents other than Ozment and Herring were to maintain surveillance of the purchase of narcotics and of those involved and thereafter to make an arrest of all defendants concerned and recover the expended money. Ozment and Herring explained to the others that they were to pick up Thomas at 175th Street, Redondo Beach, California, then proceed to her source of supply and make the purchase. They also related that Thomas had given them two telephone numbers where she could be contacted, one of which was traced to the 175th Street address and the other to the Spreckles Street address.

Agent Raymond McKinnon, one of the group, had observed Carol Thomas on April 30 and May 8, prior to May 12, the date of the events detailed here. On this occasion, he observed Thomas leave the government vehicle of Ozment and Herring, walk to Spreckles Street where

she proceeded down about three houses "and entered Cisneros' residence." [1]

Thereafter he observed Thomas and Cisneros come out of the house together, R.T. 27, and walk toward the automobile of Ozment and Herring. Cisneros followed Thomas at a distance of from three feet to six feet and stopped before Thomas reached the agents and out of their sight waited for her. Thomas returned in a few minutes and Cisneros walked back to the house with her where they entered together.

In the meantime, Thomas had delivered to agents Ozment and Herring 30.02 grams of heroin for which she was given $700 in money that had been marked with fluorescent powder and listed. McKinnon then heard agents Ozment and Herring come on the two-way radio stating that the buy had taken place and that they were to arrest all defendants. McKinnon was then about one quarter block away. He drove at once to the house, slammed on the brakes and ran toward the front door just as Carol Thomas was coming out. One of the other government vehicles was coming up at the same time. Agent Richardson who was with him, placed Thomas under arrest and McKinnon ran on to the front door. The front door was slammed in his face. McKinnon did not knock but forced the door open and announced himself "as police as I was entering the door." [2] He noticed Cisneros make a movement towards the bed in the bedroom and then seeing the agent coming through the door he ran out the back with the agent in pursuit. As Cisneros ran out the back door and around the house, McKinnon observed him toss away an object which was later recovered and identified as the $700 purchase fund given to Thomas. When Cisneros was placed under arrest outside the house, he was returned to the house and a package of cigarettes was taken from him which when examined was found to contain a small amount of heroin. His hands and those of Thomas at this time were put under an ultra violet lamp and revealed the markings of the fluorescent powder with which the purchase money had been dusted.

An additional 64.44 grams of heroin were found in Thomas' bedroom inside the house. That heroin was the subject of count four of the indictment upon which the trial court granted a judgment of acquittal.

An extended hearing was first held on a motion to suppress. Appellant sought to suppress the introduction of any of the heroin described in the indictment as evidence in any criminal proceeding. C.T. 4. At the conclusion of the presentation of the evidence on this issue, the motion was denied. The parties then stipulated that the evidence on the motion be considered on the trial of the case with the parties to have the right to present additional evidence and that the trial be to the court. The conviction fol-

1. Although the house, as later developed, was not "Cisneros' residence," the facts as observed by the agent taken in the context of Thomas' statement that she was proceeding to her "source of supply" who was a man named Joe, and that she had given the telephone number of the Spreckles Street house as one of her contacts, bear on the reasonableness of his later actions.

2. Agent McKinnon was asked why he forced entry into the house. He responded:
"There were several reasons why I forced entry. One was, as I proceeded to the house to effect an arrest on Cisneros, the door was slammed and I felt that there was a good possibility of an escape. It is also quite common in narcotic cases for the destruction of the evidence, in heroin cases especially, all that has to be done is flushed down the toilet. And there was also $700 official advance fund belonging to the government that we believed to be in the house at this time.
"There was also the possibility of injury in cases like this. Some of the agents have been injured in the past if a person is of a violent nature, which we must consider everyone to be that way until proven otherwise.
"If he is given an amount of time, he could secure a gun possibly and injure someone." R.T. at 13.

lowed. The appellant assigns four questions for review, (1) lack of probable cause for arrest, (2) absence of justification for search of the house, (3) absence of justification for search of the rear grounds, and, (4) insufficiency of the evidence.

■ Probable cause to arrest under the circumstances disclosed here is governed by federal standards. Rocha v. United States, 387 F.2d 1019, 1022 (9th Cir. 1967), cert. denied, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). An arrest by federal narcotics agents can be made without a warrant when they have reasonable grounds to believe that the person arrested has committed a violation of the Federal Narcotics law. 26 U.S.C. § 7607;[3] Jordan v. United States, 416 F.2d 338, 345 (9th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 930, 25 L.Ed.2d 101 (1970). Reasonable grounds as used in 26 U.S.C. § 7607, and probable cause as used in the Fourth Amendment have the same meaning. Ng Pui Yu v. United States, 352 F.2d 626,

630 (9th Cir. 1965). Thus, appellant's extensive reliance upon California law in his brief is misplaced. We turn then to a consideration of the facts giving the agents probable cause to believe Cisneros had participated in a narcotics transaction. Thomas had previously sold narcotics to agents, once in this approximate location; Thomas had given the agents a telephone number which was located in the house on Spreckles Street. Cisneros' involvement is derived from Thomas' statements to the agents that she had to get the heroin from a connection,[4] and as well from his conduct during the sale in walking out with Thomas, waiting for her to complete the sale, and then returning with her to the house. Without more, Cisneros' conduct could be arguably considered innocuous. But there is more. When the agents approached the house, Cisneros slammed the door.[5] Refusal of entrance to a known law officer can be considered as a factor in establishing probable cause. Martone v. United States, 396 F.2d 229 (1st Cir. 1968); Rodriguez v. Hanchey,

3. 26 U.S.C. § 7607 provides, in pertinent part:

"The Commissioner * * *, and agents, of the Bureau of Narcotics of the Department of the Treasury * * *, may—

* * * * *

(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs * * * where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The authority of Bureau of Narcotics Agents to make warrantless arrests is now found in 21 U.S.C. § 878 (1971 Supp.), which became effective after this arrest. Congress provided that pending prosecutions involving arrests under § 7607 were to be governed by that law. Act of Oct. 27, 1970, Pub.L.No.91–513 § 1103(a), 84 Stat. 1294.

4. The district court discussed Thomas' later trial testimony, R.T. 222, that the heroin was hers, R.T. 123, and no connection was involved, and concluded that her conduct in taking some of the heroin out for a fix shortly before the sale was

inconsistent with her claim of ownership. Her conduct in fixing with part of the heroin to "get ahead" is consistent with the story that Thomas had given to the agents earlier, that her source of supply was a man named Joe.

5. McKinnon testified as to these facts but on cross-examination admitted that he could not positively identify Cisneros as the person who slammed the door. Although there was conflicting testimony on whether the door was slammed, the government is entitled to that inference on appeal. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The identity of the person slamming the door, which could be regarded as doubtful on McKinnon's testimony alone was at least sufficient to allow McKinnon to conclude that the man he had observed taking part in the transaction outside had refused him entry. That belief is corroborated by the testimony of the occupants of the house who placed only two men in the house; the father of Cisneros' girlfriend, who was in his bedroom when the entry was made, and Cisneros who was in the living room. If anyone refused entry, Cisneros must have been the one.

359 F.2d 724, 727 (5th Cir.), cert. denied, 385 U.S. 884, 87 S.Ct. 179, 17 L.Ed.2d 112 (1966). *Cf.* United States v. Soyka, 394 F.2d 443, 453 (2d Cir. 1968) (en banc rehearing), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969).

■ Thomas testified that she knew what was happening as soon as she saw the cars approach the house. R.T. 129. Cisneros testified that he did not know if the approaching people were police or someone Carol Thomas had just defrauded in a narcotics transaction. Cisneros denied seeing the cars approach. Miss Helen Montanez, Cisneros' girlfriend, who was sitting on the couch in the living room with Cisneros, saw the agents approaching in their cars down the street. R.T. 74. Cisneros had the same view. R.T. 78. We think the trier of fact was entitled to disbelieve Cisneros' testimony that he did not see the agents' cars approach. And, furthermore, we think it proper to conclude that as an addict with a prior conviction he had some familiarity with police procedures. Cisneros probably concluded, as did Carol Thomas, that the officers' conduct was not ambiguous and that the persons approaching the door were police. And, in light of Thomas' conduct, which Cisneros realized could have been a narcotics transaction, R.T. 216–17, Cisneros had reason to believe the people approaching his house were engaged in a narcotics raid. Thus, we conclude that Cisneros' behavior in slamming the door in the face of the approaching agent and the deviousness of the entire transaction are elements adding to the proof of probable cause, and we conclude that Agent McKinnon had probable cause to arrest Cisneros prior to the time McKinnon forcefully entered the Spreckles Street residence in pursuit of Cisneros.

We turn next to Cisneros' complaints about the search of the house and grounds. He complains that the evidence obtained by the search of the house and the backyard exceeded the permissible scope of a search incident to an arrest because the search was not confined to the immediate vicinity of the arrest, which was in the side yard of the house, nor was it substantially contemporaneous with the arrest, because the officers examined Cisneros' hands in the house before searching the backyard.

■ With respect to the search of the house and Cisneros, no heroin was discovered which became the basis for conviction. The small amount of heroin found in a cigarette package on Cisneros was not the subject of any indictment. Some 64 grams of heroin found under Thomas' mattress was the subject of Count I, but a motion for acquittal was made as to this heroin and the motion was granted.

■ The discovery of the money in the backyard simply does not involve a search, but rather the money was in plain view of the officer who saw Cisneros throw it away when he went through the backdoor of the house in flight. Capitoli v. Wainwright, 426 F.2d 868 (5th Cir. 1970). The only question raised by Cisneros which bears on this point is whether the view was the fruit of an illegal entry, which would require its exclusion. The illegal entry is also argued to be a basis for excluding the results of the examination of Cisneros' hands under blacklight, Cisneros' throwing of the money, and his prior possession of it. Without these facts, the evidence is argued to be insufficient to support the conviction. That question will be considered *infra.* All of these issues turn upon the legality of the entry, and we consider that issue next.[6]

---

6. The legality of the entry is a question apart from the initial validity of the arrest, whether it is based upon a warrant or probable cause. *E. g.,* Williams v. United States, 273 F.2d 781, 789–792 (9th Cir. 1969). Assuming a valid basis for arrest, an illegal method of execution, for instance an unlawful forcible entry, can result in the exclusion of any evidence obtained as a result of the officer's illegal conduct. United States v. Scharf, 421 F.2d 1239, 1240 (9th Cir. 1970) (implied holding); Theobald v. United States, 371 F.2d 769, 771 (9th Cir. 1967).

The legality of the entry has not been formally raised by the appellant on this appeal, but has been discussed throughout appellant's brief ("Conclusion," in particular) and was urged at oral argument.

Under the circumstances of this case we believe Rule 28(a) (2), Fed.R.App.P., should not be so applied as to constitute an abandonment by appellant of this issue on appeal and we consider it.

The agents had no warrant for the arrest of the man who accompanied Thomas part way to and from the "buy." When he slammed the door in the face of agent McKinnon, the latter had no right either to force the door open or to enter it by turning the knob, unless he could justify his action by the law as it then existed.

 A warrantless entry, such as was made here, by federal officers to arrest for a federal offense requires the officer to give notice of his authority and purpose before using force to enter for the entry to be valid.[7] Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1968); Ng Pui Yu v. United States, 352 F.2d 626, 631 (9th Cir. 1965). *Cf.* Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). An exception exists for *arrests* under exigent circumstances. Such circumstances may be present where entry is clearly refused, or a possibility of escape or destruction of evidence exists. Miller v. United States, *supra.* Here, the entering agent knew Cisneros was running. Given Cisneros' prior participation in the sale, and the information given by Thomas, the agent could logically conclude that Cisneros was attempting to escape. R.T. 13. Such a possibility excuses the requirement of an announcement as does an arrest following "hot pursuit." Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); McDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948). Likewise, the completion of the sale, plus the fact that Cisneros ran, could allow the officer to reasonably believe that additional contraband was present and threatened with imminent destruction. *Cf.* Theobald v. United States, 371 F.2d 769, 771 (9th Cir. 1967). Here, based upon his personal observations, the information related to him, and the actions of the defendant, we believe the trial court was not in error in holding that the agent need not have stopped and announced his identity and purpose before completing his mission.[8]

Because the entry was valid, it follows that the officer's view of Cisneros throwing the money was lawful. Thus, the officer had a right to recover the money from the backyard, and it was correctly admitted.

 Finally, we deal with Cisneros' contention that the evidence is not sufficient to support the conviction. In Cisneros' view, the evidence linking him to the money is the crucial issue. We think that link may be shown by two alternative sets of facts: First, the evidence which was admissible after the entry was more than sufficient to show that Cisneros actively participated in the transaction. He was present; he accompanied Thomas; he held the proceeds of the sale. Second, the evidence apart from that seen after the entry, and acquired before and independently of the entry, is also sufficient. Counts 1, 2 and 3 of the indictment are based upon the sale and delivery of the 30.02 grams to Ozment and Herring. This heroin was not obtained as a result of the entry,

7. The requirement of notice before entry for warrantless searches was derived from 18 U.S.C. § 3109, which applied only to entry to execute a warrant:

 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

8. See *supra* note 2, for Agent McKinnon's statement of his reasons for forcing the door, all of which appear. to have been supported by the evidence.

legal or illegal. Nor is the entry necessary to connect Cisneros with the money which links him with the "buy". Thomas was put on the stand by defense counsel at the hearing on the motion to suppress and testified that she made the sale of the 30.02 grams of heroin to Ozment and Herring and delivered it to them. They gave her the $700 which she took back to the house and the agents kept the heroin which had thus been delivered to them. Thomas then testified that she gave the $700 to Cisneros and asked him "if he would hold the money for me" because she was afraid someone might rob her. R.T. 117. She also testified that both she and Cisneros were addicts at the time. R.T. 122.

This evidence was put into the record by the defendant in support of the motion to suppress. The motion to suppress was based upon the charge that this 30.02 grams was obtained by means of an unreasonable search and seizure. C.T. 4–5. Obviously it was not.

When the motion to suppress was denied, the parties then stipulated that all of the evidence introduced on the hearing on the motion to suppress "could be adopted for purposes of trial." R.T. 163. Thereafter the parties proceeded to the point where a motion for acquittal was filed. All of the motion to suppress testimony was then before the court including that of Carol Thomas.[9]

Thus, on the motion for acquittal the court has properly before it all of the facts of which the agents were aware prior to the forcing of the door, plus the fact that Thomas when she came back from the "buy" gave the entire $700 to Cisneros, as she explained it, to keep for her. Moreover all of this evidence was before the court entirely apart from the asserted forcible entry and would be sufficient not only to withstand the motion for acquittal but support the judgment of the court as to the first three counts. The court could have inferred from the evidence before it at this time that Thomas was a peddler of heroin; that she obtained her supply from a man named Joe; that she offered to sell 30.02 grams to Ozment and Herring but had to go to her source of supply to obtain it; she directed them to the neighborhood of the Spreckles Street address as the location of her source and then left them to wait for her while she obtained it. At this point the other officers verified the fact that she walked to the Spreckles Street house, went in and shortly came out with a man who later turned out to be the defendant. She returned to Ozment and Herring with the defendant following part way and a few steps behind her. After the transaction was complete, she returned and met the defendant and together they walked back into the house where she gave him the entire $700 of government money because it was Cisneros' heroin and his money, and he was a principal in the transaction. True, she stated that the heroin belonged to her, that she alone made the sale, and that she gave the money to Joe, a fellow addict, to safely keep for her. On the defendant's later case, after the motion for acquittal was properly denied, he took the stand and explained his possession of the money the same way, adding that as he fled he threw the money (her money?) away because he "wanted to get rid of it." R.T. 213.

A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn. Dyer v. MacDougall, 201 F.2d 265, 268 (2d Cir.

---

9. That this is abundantly clear is made apparent from the colloquy between the court and counsel for defendant in the argument on the acquittal motion. R.T. 198–201. In fact, defense counsel uses the Carol Thomas testimony introduced on the motion to suppress in argument in support of his motion for acquittal. R.T. 200.

1952); Judge Learned Hand in *Dyer*, stated the proposition as follows:

> "It is true that the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence.
>
> \* \* \* \* \* \*
>
> [The jury] may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." (Footnote omitted).[10]

The trial court here considered all of the circumstances and came to the conclusion that Cisneros was a participant in the crime and guilty on each of the first three counts involving the heroin sold by Thomas to the agents. He could reach this conclusion without ever having to pass upon the forcing of the door and the asserted unlawful search and seizure.

The evidence was clearly sufficient to support the convictions on the first three counts whether the court consider it together with or apart from the forcible entry.

The judgment is affirmed.

have a verdict or judgment on appeal set aside if based solely on "demeanor evidence." Here the "demeanor evidence" is reinforced by inconsistencies of record, objective testimonial evidence and other facts which the trial court relied upon.