**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bradley Sisson BARHAM, also known as Bradley Anderson, Defendant-Appellant.**

**No. 72-1402.**

United States Court of Appeals, Ninth Circuit.

Sept. 5, 1972.

Rehearing Denied Oct. 16, 1972.

Howard Lonergan (argued), Benhardt E. Schmidt, Portland, Or., for defendant-appellant.

Mallory C. Walker, Asst. U. S. Atty. (argued), Sidney I. Lezak, U. S. Atty., Portland, Or., for plaintiff-appellee.

Before JERTBERG, KOELSCH and TRASK, Circuit Judges.

JERTBERG, Circuit Judge:

Appellant appeals from judgments of conviction pronounced upon him following a jury trial on a three-count indictment charging in Counts One and Two that with intent to defraud he passed and uttered forged and counterfeited obligations of the United States, which he then knew to be forged and counterfeited, in violation of Title 18 U.S.C. Sec. 472; and in Count Three that with intent to defraud he possessed and concealed forged and counterfeited obligations of the United States which he then knew to be forged and counterfeited in violation of Title 18 U.S.C. Sec. 472.

He was sentenced to the custody of the Attorney General for a period of ten years on each count, all sentences to run concurrently.

The only issue presented for review, as stated by appellant, is: "Was there evidence that defendant knew the money was counterfeit?"

The essential facts, stated in a manner most favorable to the Government, may be summarized as follows:

On the morning of June 29, 1971, the appellant purchased a money order at the Commercial Bank in Newberg, Oregon, made payable to Bradley Anderson in the amount of $250.00, in exchange for twelve $20.00 bills and one $10.00 bill. The name signed to the application for money order by appellant was Bradley Anderson. Nine of the $20.00 notes were counterfeit.

After leaving the Commercial Bank, appellant paid a $363.00 truck repair bill, incurred by him under the name of Bradley Anderson, with the $250.00 money order and six counterfeit $20.00 notes. Appellant was given a receipt in the name of Bradley Anderson, in the form of a final work order marked "Paid."

On June 30, 1971, appellant was arrested for passing counterfeit notes. An examination of his wallet, voluntarily handed to a Secret Service Agent, revealed eighteen counterfeit $20.00 notes of the same type that were passed to the bank and to the garage. The counterfeit money was all together in the wallet, together with $162.00 worth of genuine currency, consisting of a $100.00 bill, several $10's, and a $5.00 and two $1's.

Of the thirty-three (33) counterfeit notes, including nine (9) passed at the Commercial Bank, six (6) passed at Bob's Auto Company, and eighteen (18) found in the appellant's wallet, seven (7) contained the identical serial number B 07896834 A; seven (7) contained the identical serial number B 91618342 A; seven (7) contained the identical serial number B 77853003 A; six (6) contained the identical serial number B 41838060 A; four (4) contained the identical serial number B 81011259 A; and two of them contained the identical serial number B 81128913 A.

On July 14, 1971, appellant appeared with his attorney and gave a voluntary statement to the Secret Service Agents. Appellant said that a month prior to his arrest (about May 31, 1971) he picked up a hitchhiker. En route to Portland, Oregon, the hitchhiker asked appellant if he knew where the hitchhiker could obtain some marijuana. Appellant told the hitchhiker he thought he could get some for him, and they reached an agreement on the price while riding to Portland. The hitchhiker got out of appellant's car at a restaurant; the appellant drove away and later returned with four kilos of marijuana. The hitchhiker was waiting. After briefly examining the marijuana, the hitchhiker took out a roll of twenty-dollar bills. He counted out forty-five (45) notes ($900), gave them to appellant, and departed with a shopping bag full of marijuana.

At the trial appellant testified that he obtained the marijuana from a person who owed him approximately $800. He refused to name him. Appellant described the hitchhiker as about five foot nine, one hundred thirty-five pounds, dirty blonde hair, a beard and a wispy moustache, who had an unkempt appearance and appeared to be "one of the street people."

Appellant stated that he knew nothing about the hitchhiker's background or identity.

He stated he was using the alias "Bradley Anderson" because he was living in common-law marriage with his girl friend and did not want her parents to know.

He stated that he purchased the $250 money order instead of paying cash for the repairs at the garage because he had been cautioned about carrying large sums of money on his person, and he bought the money order instead of paying the repair bill with cash, so he would have a receipt.

It is conceded by appellant that he possessed and passed the counterfeit currency charged in the indictment. A jury, under instructions which are not questioned by appellant, returned verdicts of guilt thereby impliedly finding beyond a reasonable doubt, as facts, that, with intent to defraud at the time of such possessing and passing, appellant had knowledge that the currency was counterfeit.

In our review the evidence must be taken in the light most favorable to the jury verdict; that it is the exclusive function of the jury to determine the credibility of witnesses; to resolve evidentiary conflicts, and draw reasonable inferences from proven facts. We must assume that the jury resolved all such matters in a manner which would support the verdict. See United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969).

The jury was not bound to accept appellant's testimony that he did not know that the currency was counterfeit. It was not bound to accept, as true, his account of the circumstances of the acquisition of the counterfeit currency which, to say the least, borders upon incredulity. It was not bound to accept his explanation of the use of the alias. All of such circumstances were reasonably susceptible to the drawing, by the jury, of inferences adverse to appellant's contentions.

"A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the cir-

cumstances, including the manner in which they testify, a contrary conclusion may be drawn." United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1971).

See also United States v. Randolph, 456 F.2d 689 (9th Cir. 1972).

■ We are satisfied that the evidence before the jury, with reasonable inferences to be drawn therefrom, was sufficient to justify it in finding beyond a reasonable doubt that appellant, with intent to defraud, knew that the currency possessed and passed by him was counterfeit.

The judgment appealed from is affirmed.

KOELSCH, Circuit Judge (dissenting).

I respectfully dissent. Granted, an appellate court reviewing a conviction must view the evidence in a light most favorable to the government [Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942);] but this record reveals no evidence, substantial or otherwise, tending to prove the conclusion, let alone prove beyond a reasonable doubt, appellant's scienter.

Knowledge can, of course, seldom be proven directly, and in the great majority of counterfeiting cases, the prosecution offers circumstantial proof from which the jury can infer the requisite knowledge. See, e. g., United States v. Bean, 443 F.2d 17, 18–19 (5th Cir. 1971); United States v. Knight, 426 F. 2d 818 (4th Cir. 1970); Ruiz v. United States, 374 F.2d 619 (5th Cir. 1967). "Of course either direct or circumstantial evidence may fail to prove the fact in issue—direct evidence because the credibility of the witness is destroyed; circumstantial evidence for that reason, or because the inference from the proven circumstances to the fact in issue is too speculative, or remote." United States v. Nelson, 419 F.2d 1237, 1240 (9th Cir. 1969). When reviewing evidence for sufficiency the question is "whether the jurors could reasonably arrive at [their] conclusion." *Id.* at 1243. On this record the question should be answered in the negative.

The government adduced circumstantial evidence on the following matters to prove that appellant possessed the required guilty knowledge—the fact that he negotiated the counterfeit bills under the name Anderson rather than his true name; the manner in which appellant carried the bills in his wallet; and the manner in which the bills were negotiated. While proof of such nature can provide the necessary element of knowledge in a proper case, it is clear that no inferences could have reasonably been drawn from the government's evidence as it appears in this record.

First: Appellant had been known as Anderson in the Newberg, Oregon area, for several months before he passed the bills there. He was not a transient. He had come to Newberg and, together with his "girl friend," had taken up residence under that name. He signed the lease on the premises where they lived under that name. And he had consistently used that name in his business dealings. His transactions with the local bank and garage under that name could not suggest an attempt at deception. It is irrelevant what the jurors may have thought of appellant for living with his girl friend under an assumed name; the significant issue is whether the jurors could infer that he used the name to conceal his identity when passing counterfeit money. On the facts as developed, they could not.

Second, the government emphasized in its closing argument to the jury (and again in its brief on appeal) that when the Secret Service agents searched appellant's wallet, they found that the counterfeit 20-dollar bills were somehow separated from the genuine currency: "They were segregated so that they were all together in a compartment of the wallet." This assertion simply was not true. The agent who searched the wallet testified only that the counterfeit bills, which were the only 20's in the wallet, were "all together *between* $162

worth of genuine currency. There was a hundred-dollar bill, several tens and a five, and two one's, I believe." (emphasis added). In other words, if the bills were segregated, it was by denomination only. If this is sufficient to suggest an inference of criminal knowledge, then ". . . men in this country must change their ways of carrying money." Paz v. United States, 387 F.2d 428, 431 (5th Cir. 1967).

Third, the government suggests that the appellant's pattern of passing the counterfeit bills suggests an inference that he knew the bills were not genuine. Its theory was that there was no other explanation for appellant's first obtaining a $250 money order at the local bank before he went to the nearby garage to pay a $363 bill. On closing argument, the United States Attorney went so far as to state that appellant purchased the $250 money order, with twelve counterfeit twenties and a genuine ten, to "test" the quality of the bills before attempting to pass any more bills at the garage. This argument assumed, without any evidentiary support, that appellant knew that the amount of the repair bill would be larger than the value of the money order appellant purchased at the bank. In fact, the garage employee who testified for the government stated that the garage had given appellant an estimate for repair work of $250. The need for additional work was discovered later, and none of the government's evidence shows that appellant was made aware that the actual repair bill would exceed the estimate by more than one-hundred dollars. With these facts in mind, appellant's purchase of a money order for $250, rather than for some larger amount, lends absolutely no support to the government's theory, or to an inference of illegal behavior. Moreover, it seems incredible that appellant, if he wished to test the bills, as the government contends, would attempt to pass twelve of them for that purpose at a single establishment in his home community.

In short, the government took evidence of essentially innocent behavior and magnified it far beyond its probative significance (both by speculation and by outright misrepresentation of the evidence in closing argument) to prove an essential element of the offenses charged. None of the three matters, alone or in combination, as they are developed in this record, provide a sufficient evidentiary foundation for a guilty verdict.

The final matter to be considered is appellant's account of how he came into possession of the counterfeit bills. The government argued that because appellant gave only a vague description of the hitchhiker, because he "refused" to name his source of marijuana which he allegedly sold to the hitchhiker, and because the story was generally incredible, the jury could have rejected it as a fabrication and drawn the contrary inference that appellant knew the money was counterfeit. Again the record does not support the government's position. Both Secret Service agents who interrogated appellant, after his arrest, testified that he did provide them with a physical description of the hitchhiker, and one of the agents specifically disclaimed any suggestion that appellant was evasive or uncooperative when questioned. And, there is no evidence in the record to suggest that appellant refused to identify his marijuana source. Neither Secret Service agent testified that appellant was ever asked about his source, and at the trial the prosecutor so much as foreclosed the issue of the source's identity when he asked appellant: "Now, again, I don't want you to implicate anybody, but I want you to tell the jury how and under what circumstances you obtained the marijuana."

What remains is the government's assault on the credibility of the story in general. Of course, the jury did not have to believe appellant's story. However, even if the story were disbelieved, I cannot agree that, absent some significant evidence of knowledge, the jury

could infer the fact in issue merely because it rejected appellant's story. The burden of proving guilty knowledge is on the government; it is not up to the appellant to disprove it. See Murray v. United States, 403 F.2d 694 (9th Cir. 1968). And, as I have attempted to portray above, there was no other sufficiently probative evidence upon which the jury could have reasonably found knowledge. Compare United States v. Cisernos, 448 F.2d 298 (9th Cir. 1971).

The conviction should be reversed.