UNITED STATES of America,
Plaintiff-Appellee,

v.

Francisco BUSTAMANTE–GAMEZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Abelardo GARCIA–RAMIREZ,
Defendant-Appellant.

Nos. 72–3188, 72–3189.

United States Court of Appeals,
Ninth Circuit.

Oct. 24, 1973.

Lewis A. Wenzell (argued), Federal Defenders, San Diego, Cal., for defendants-appellants.

Douglas G. Hendricks, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Stephen G. Nelson, Jeffrey F. Arbetman, Asst. U. S. Attys., San Diego, Cal., for plaintiff-appellee.

Before DUNIWAY and TRASK, Circuit Judges, and LUCAS,* District Judge.

## OPINION

DUNIWAY, Circuit Judge:

Bustamante-Gamez and Garcia-Ramirez appeal from their convictions under 21 U.S.C. §§ 841(a), 846, for possessing marijuana with intent to distribute and conspiring to commit that offense. They challenge only the district court's denial of their motion to suppress certain evidence obtained as a result of an allegedly improper search. We affirm.

On August 9, 1972, Customs agents at the port of entry at San Ysidro, California, discovered 40 kilos of marijuana hidden in a compartment above the gas tank of a 1964 Pontiac station wagon which had been driven into the United States from Mexico. The driver said that he had been hired to deliver the car to a parking lot near the San Diego Zoo. The agents accompanied him to this location, and set up a watch.

A short time later the Pontiac was entered by two Mexican-appearing men, who drove it to the 11000 block of Calle Jalapa in San Diego and parked it on the street. A stake-out of this area was set up by the law enforcement officials, whose ranks had by now swelled to include five Customs agents and two San Diego police officers. Of necessity, they positioned themselves out of sight of the Pontiac. After a wait of some twenty minutes, one of the agents discovered, to his horror, that the Pontiac had disappeared. A radio check with the other officers indicated that it had not left Calle Jalapa, and an intensive investigation of that area was begun.

Before losing the Pontiac, the officers had seen the following: When they had first arrived on the scene, three garage doors of the homes on the block were open. The owner of one of those houses, at 11262 Calle Jalapa, directly across the street from where the Pontiac was parked, later identified as one Bill Barsby,[1] had been seen watering his lawn and conversing with a Mexican male who fitted the description of the driver of the Pontiac. Barsby had also been seen driving a red Chevrolet, making a U-turn, and apparently looking at the officers who were conducting the stake-out. The officers now observed that two of the garages were closed, one at 11262 Calle Jalapa, and one on the side of the street located where the Pontiac had been, one house down from that point. The agents' investigation added something to this information. Neighbors informed them that Barsby was normally at work at that time of day, and that young Mexican males had been known to frequent a house near where the Pontiac had been parked. However, that house could not be identified with any particularity, nor had anyone seen the car driven into a garage.

Finally, one of the agents walked up a short driveway to the garage door at the 11262 address and heard sounds which he described as "cloth dragging on the cement floor, a grunt, groan, and a tool hitting the floor." He notified the other officers of his discovery, and they congregated at that house. One of them approached the front door, knocked, and announced that he was a federal officer

---

* The Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

1. Barsby was later acquitted of charges similar to those brought against Bustamante and Garcia, but this fact is irrelevant to determination of the Fourth Amendment issues.

who was there to make an arrest. Simultaneously another agent opened the garage door, which was unlocked, revealing the Pontiac, the defendant Bustamante, and several kilo bricks of marijuana. Garcia was later found hiding in a doghouse in the back yard.

## 1. *Probable cause.*

■ The primary issue on this appeal is whether the officers had probable cause to believe that the Pontiac was in the garage at 11262 Calle Jalapa. The question is a close one. We hold that, before obtaining information through eavesdropping at the garage door, the officers had probable cause to believe that the car was inside. Certainly they had probable cause to believe that the car was in one or the other of the two recently closed garages. There was nowhere else for it to be. The activities of Barsby, including the fact that he had been observed talking with a man who resembled the driver of the load car, gave them reason to believe that he was in on the plot, and that the car was in his garage rather than the other garage. The eavesdropping confirmed that belief.

## 2. *The validity of the entry.*[2]

■ The defendants argue that, assuming that the officers had probable cause to believe that the Pontiac was in the garage at 11262 Calle Jalapa, the entry[3] upon the driveway to listen, and the entry into the garage were illegal because no warrant was obtained and, as to entering the garage, because the requirements of 18 U.S.C. § 3109 were not complied with. We disagree.

### A. *The Warrant Issue.*

■ The entry upon the driveway and the later entry into the garage have

raised somewhat different legal problems. Before the eavesdropping, the officers did not know whether anyone was in the garage or the house. Whoever put the car in the garage might have left by a route at the back of the house, not visible to the officers. Thus the officers had cause to believe only that the car, loaded with contraband, was in the garage. Entering the driveway was for purposes of "search"—i.e., to overhear. Katz v. United States, 1967, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576. It was not an entry to arrest.

■ The entry into the garage is different. What the officers heard in the driveway supported a reasonable belief that someone was then working on the car. The Pontiac was "poison." It was known to contain contraband, which could be seized, and the car was subject to possible forfeiture. It was thus a legitimate objective of a search. Moreover, anyone exercising dominion over it was subject to arrest, with or without a warrant. *See* 26 U.S.C. § 7607(2); United States v. Cisneros, 9 Cir., 1971, 448 F.2d 298, 302. It makes no difference that the officers did not know the identity of whoever was in the garage. United States v. Llanes, 2 Cir., 1968, 398 F.2d 880, 883. The entry into the garage was expressly for the purpose of an arrest.

■ For the purpose of this case, we assume that the eavesdropping involved an entry upon the curtilage, and thus could be lawfully made, even with probable cause, only under a warrant or under exceptional circumstances permitting entry without a warrant.

It is by no means certain that the entry upon the driveway was contrary to the Fourth Amendment, even though there were no warrant or exceptional circumstances excusing failure to obtain

---

2. The Government argues that the defendants lack standing to challenge the search. This argument is frivolous and we do not pause to consider it.

3. It is well established that illegal entries vitiate subsequent searches or seizures, even if

the evidence is in plain view after the entry. See Coolidge v. New Hampshire, 1971, 403 U.S. 443, 464–473, 91 S.Ct. 2022, 29 L.Ed.2d 564; United States v. Cisneros, 9 Cir., 1971, 448 F.2d 298, 303, note 6.

one. The driveway may not have been such a place as to support a reasonable expectation of privacy on the part of the defendants. See *Katz, supra,* United States v. Fisch, 9 Cir., 1973, 474 F.2d 1071, 1076–1079; Ponce v. Craven, 9 Cir., 1969, 409 F.2d 621, 625; Wattenburg v. United States, 9 Cir. 1969, 388 F.2d 853, 857–858; Cf. Polk v. United States, 9 Cir., 1961, 291 F.2d 230, 232, on remand, N.D.Cal., 1961, 201 F.Supp. 555, afd., 1963, 314 F.2d 837, and, *see generally,* Note, From Private Places to Personal Privacy; A Post-Katz Study of Fourth Amendment Protection, 43 N.Y. U.L.Rev. 968, 982–86 (1968). However, for reasons that will appear, we need not and do not decide this question.

As we have seen, the entry into the garage was to make an arrest.

At common law, the legality of an arrest entry turned upon the legality of the arrest; if a warrantless arrest was permissible, so was a warrantless entry made for that purpose. *See* Wilgus, Arrest Without a Warrant, 22 Mich.L.Rev. 541, 558, 802–06 (1924). For a considerable period of time it was apparently assumed that this doctrine was incorporated into the Fourth Amendment. *See* Coolidge v. New Hampshire, 1971, 403 U.S. 443, 511–512, n. 1, 91 S.Ct. 2022, 29 L.Ed.2d 564 (opinion of White, J.). However, with the further development of the principle that considerations of individual privacy are at the core of the Fourth Amendment and that the "incident to arrest" and "plain view" doctrines are exceptions to the search warrant requirement, the validity of this assumption began to be questioned. *See generally* Note, The Neglected Fourth Amendment Problem in Arrest Entries, 23 Stan.L.Rev. 995 (1971). Neither this Court nor the Supreme Court of the United States has yet specifically passed upon the issue, and it is therefore one of first impression in this Circuit. *Compare* Coolidge v. New Hampshire, *supra,* 403 U.S. at 473–484, 91 S.Ct. 2022 (opinion of Stewart, J.) *with id.* at

510–512, 91 S.Ct. 2022 (opinion of White, J.) and *id.* at 492, 91 S.Ct. 2022 (opinion of Harlan, J.). *But see* Dorman v. United States, 1970, 140 U.S. App.D.C. 313, 435 F.2d 385, 388–391, holding that a warrant is required for an arrest entry absent a showing of urgent need). We need not, in this case, decide this question.

▮ Assuming that the Fourth Amendment requires a warrant for an arrest, as it does for a search, we conclude that in this case both the search (entry upon the driveway) and the arrest (entry into the garage), fall within a well recognized exception to the warrant requirement. Here there were exigent circumstances justifying both entries without a warrant.

This was not a situation in which probable cause is obtained through normal investigative procedures and the officers can procure a warrant and then go to the suspect's residence and make a search or an arrest. Here, they were starting from scratch when the Pontiac disappeared, and they had reason to believe that their presence had been detected. They had reason to believe that Barsby had discovered the stake-out before the load car disappeared; he had in fact looked at the officers while making a U-turn in his automobile. In this respect this case differs from United States v. Marshall, 9 Cir., 1973, 488 F.2d 1169 (at 1189–1190). It closely resembles United States v. Rubin, 3 Cir., 1973, 474 F.2d 262. Time was clearly of the essence, and probable cause to believe that the Pontiac was being unloaded in the garage at 11262 Calle Jalapa was obtained during a furious combing of the neighborhood.

At this point, it may have been theoretically possible for the officers to withdraw and obtain a warrant. However, the method of investigation had made it more than probable that the occupants of the garage knew or might at any time learn of their presence.[4] Thus

4. We have no doubt that the officers were making a good faith attempt to locate the car; they were not creating exigent circumstances. A different case would be present-

there was a substantial possibility that they would try to escape or destroy the evidence.

These same considerations militated against cordoning off the residence while awaiting a warrant. While such action may be appropriate in many cases, here it would have been equivalent to laying public siege to the premises. This would enable, perhaps provoke, the suspects to take steps to destroy the evidence, set up resistance to an eventual entry, or plan a desperate flight. These factors are especially significant in light of the nature of the area; it was a residential neighborhood, and the residents were already coming out of their houses to observe the events. The benefits to be derived from obtaining a warrant simply would not have justified this additional risk. In short, whatever the general rule regarding warrantless arrest entries, we hold that the need for such an entry in this case arose "under circumstances of necessity which preclude[d] recourse to judicial channels." Note, *supra*, 23 Stan.L.Rev. at 1005.

For the purposes of this case, what we have said is equally applicable to the search entry and to the arrest entry. Both, in our opinion, were lawful.

### B. *The Section 3109 Issue.*

■ The defendants also argue that the entry into the garage was improper because of the agents' failure to comply with 18 U.S.C. § 3109. That statute provides:

"The officer may break open any outer door or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

It is clear that these requirements apply to warrantless arrest entries and to the type of "breaking" that took place in this case, i.e., the opening of an unlocked door.[5] Sabbath v. United States, 1968, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828.

■ The roots of section 3109, commonly referred to as the "rule of announcement,"[6] extend well back in the history of Anglo-American jurisprudence. *See* Sabbath v. United States, *supra*, at p. 589, 88 S.Ct. 1755, Sonnenreich and Ebner, No-Knock and Nonsense, An Alleged Constitutional Problem, 44 St. John's L.Rev. 626, 627–39 (1970); Blakey, The Rule of Announcement and Unlawful Entry: Miller v. United States and Ker v. California, 112 U.Pa.L.Rev. 499, 500–16 (1964). It is now clear that, to some extent, its requirements have been incorporated into the Fourth Amendment. *See* Ker v. California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. Three interests are said to be served by the rule of announcement: (1) it reduces the potential for violence to both the police officers and the occupants of the house into which entry is sought; (2) it guards against the needless destruction of private property; and (3) it symbolizes the respect for individual privacy summarized in the adage that "a man's house is his castle." *See* Miller v. Unit-

ed if there were the possibility of abuse. As we said in Davis v. United States, 9 Cir., 1964, 327 F.2d 301, 306:

"On this excursion of law enforcement officers across the quagmire of search and seizure without warrants of any kind, only a thin chair of unusual circumstances upon which beamed the most benign smile of the Goddess of Fortune has enabled them to escape safely and legally with their usually forbidden fruit."

5. The Government does not argue that the garage was not part of the house for purposes of section 3109, and we assume that it was. *Cf.* United States v. Mullin, 4 Cir., 1964, 329 F.2d 295, 298 (statute supplied to invalidate entry into smokehouse which was within the curtilage).

6. For purposes of clarity, this opinion will take the "rule of announcement" to include all of the elements of 18 U.S.C. § 3109. References to "announcement" will mean notification of authority and purpose only; it will not include the "refusal of admittance" requirement, discussed *infra*.

ed States, 1958, 357 U.S. 301, 307, 313 n. 12, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332; Note, Announcement in Police Entries, 80 Yale L.J. 139, 140–41 (1970).

Nonetheless, it has never been suggested that the requirement is an inflexible one; both at common law and in the constitutional context the courts have acknowledged that the interests enumerated above may give way to other considerations. While the limits of these exceptions are by no means clear, they generally stem from the exigencies of law enforcement or involve situations in which compliance with the rule would be mere ritual. *See* Ker v. California, *supra*, 374 U.S. at 38–41, 83 S.Ct. 1623 (opinion of Clark, J.); *id.* at 54–60, 83 S.Ct. 1623 (opinion of Brennan, J.); Note, No-Knock and the Constitution: The District of Columbia Court Reform and Criminal Procedure Act of 1970, 55 Minn.L.Rev. 871, 876–86 (1971). In short, "a claim under 18 U.S.C. § 3109 depends upon the particular circumstances surrounding the [entry]." Jones v. United States, 1960, 362 U.S. 257, 272, 80 S.Ct. 725, 737, 4 L.Ed.2d 697. Judged by these standards, we hold that the entry into the garage did not violate the statute.

At the outset, the defendants argue that, notwithstanding the fact that a proper announcement was made at the front door of the house, a second announcement at the garage door was necessary. We disagree. In Cognetta v. United States, 9 Cir., 1963, 313 F.2d 870, we approved an unannounced entry through the rear door of a residence which was made a few seconds after a properly announced entry through the front door. Defendants argue that *Cognetta* stands only for the proposition that "if the first of two entries, or any one of two contemporaneous entries was valid, the improper entry did not vitiate the search." (Br. at 13). However, although split-second timing is a desirable

goal in law enforcement, it would make no sense whatsoever to read *Cognetta* in this way. In view of the purposes served by the rule of announcement, it may be that under some circumstances a prior valid entry makes a subsequent unannounced entry irrelevant, but this simply is not true when the time lapse is a matter of seconds. Indeed, such a situation would make it more likely that the second group of officers would literally "break" in, because, if the occupant were disposed to admit anyone, he would naturally go to the door at which the announcement was made.

In short, the most rational explanation of the *Cognetta* result is that officers are not required to announce at *every* place of entry; one proper announcement under section 3109 is sufficient. There may be instances in which the officers' choice of place to announce is so clearly unreasonable that a second announcement is required at the actual point of entry, but this is not such a case. Here, the announcement was given at the front door of the house, and in the vast majority of cases this will be reasonable.[7] Moreover, that door was no more than twenty-five feet from the garage, and it is highly likely that a proper announcement could be heard by persons in the garage.

However, this conclusion does not end our inquiry. The district judge specifically found that the entry and announcement were simultaneous. The statute provides that the "breaking" of doors is to occur only after announcement *and* refusal of admittance. *See, e.g.*, United States v. Augello, 3 Cir., 1966, 368 F.2d 1036. If read absolutely, this requirement would invalidate the entry despite the fact that a proper announcement was made.

By and large, both the cases and the literature have concentrated

---

7. The agent testified that he believed that contraband was secreted in the house, and that it was in fact his intention to enter and make an arrest. Despite the fact that the primary area of interest was the garage, this belief was clearly reasonable.

solely upon the "announcement" portion of section 3109; little attention has been devoted to the issue of when "refusal of admittance" is necessary. Such case law as there is, however, suggests that this requirement, like the rule of announcement in general, is a flexible one which is not to be applied mechanically. *See generally* United States v. Pratter, 7 Cir., 1972, 465 F.2d 227, 231–233 nn. 10–13 (collecting cases). For example, in McClure v. United States, 9 Cir., 1964, 332 F.2d 19, we held that a refusal of admittance is generally to be implied, and that the test is whether "the circumstances were such as would convince a reasonable man that permission to enter had been refused." *Id.* at 22. In that case, the officers announced their presence, purpose, and authority, and then heard footsteps which appeared to be "running in the wrong direction." Although such facts might not be sufficient to dispense with the rule of announcement altogether, *see* Ker v. California, *supra*, 374 U.S. at 57, 83 S.Ct. 1623 (opinion of Brennan, J.), we held that the officers were justified in entering at that point.

Similarly, in United States v. Vargas, 9 Cir., 1971, 436 F.2d 1280, we upheld an entry through an open door when the announcement was made simultaneously with or just prior to entry. We emphasized that section 3109 is primarily aimed at situations involving closed or locked doors, and that the case was not one "of officers sneaking in and going prowling." *Id.*, at 1281.

The teaching of these cases is that "refusal of admittance" may not be necessary when even a mild showing of exigency is made and that, in situations not involving closed or locked doors, it is relatively unimportant. This view of the requirement is entirely consistent with an analysis based upon the interests purportedly served by the rule of announcement. To the extent that the rule prevents violence, its utility is exhausted when the actual announcement is made. The concern here is that an unannounced intrusion will provoke citizens to exercise their general right to repel intruders by force. *See* Ker v. California, *supra*, 374 U.S. at 58, 83 S.Ct. 1623 (opinion of Brennan, J.); Note, *supra*, 80 Yale L.J. at 140 nn. 5–10, 153 n. 61. However, few persons carry weapons about with them when they are at home. Thus, if announcement is made simultaneously with or shortly before entry it is unlikely that a law-abiding citizen would respond violently or provoke violence on the part of the officers. Indeed, if an occupant is predisposed to resist an entry by police, a substantial delay between announcement and entry could only give him time to prepare.

The interest in preventing the unnecessary destruction of private property is clearly not present when officers enter through an unlocked door. Thus, officers may often be required to wait until permission to enter is either explicitly or constructively denied before actually forcing their way into a residence, when they would be justified in entering only upon announcement if the door were unlocked.

The extent to which the rule of announcement protects privacy has been widely debated. It is at least clear that the rule does not, as one commentator has claimed, "secure to an individual the feeling of control over his own dwelling, upholding the dignity of the citizen against the state." Note, *supra*, 80 Yale L.J. at 153. The simple fact is that a homeowner has no right to prevent officers armed with a warrant or proper grounds to make a warrantless entry from entering his home. At the most, the "refusal of admittance" requirement gives him a few moments to decide whether or not he will open the door himself. *See, e.g.,* United States v. Woodring, 9 Cir., 1971, 444 F.2d 749 (permitting entry after a one-minute wait following announcement).

At the most, then, there are two privacy interests which the rule of announcement can be said to promote. First, it protects the homeowner from the outrage of having his "castle" sud-

**12**

denly and violently broken into. *See* Ker v. California, *supra,* 374 U.S. at 51–52, 83 S.Ct. 1623 (opinion of Brennan, J., quoting James Otis) ; Note, Police Practices and the Threatened Destruction of Tangible Evidence, 84 Harv.L.Rev. 1465, 1494 (1971). However, this interest is again served if the entry is nonforceful and a proper announcement is made; little, if anything is gained by permitting the occupant to open the door to an entry that he cannot legally resist.

Second, the rule may prevent embarrassing circumstances resulting from the unexpected exposure of private activities. Note, *supra,* 84 Harv.L.Rev.. at 1493–94. *Cf.* McDonald v. United States, 1948, 335 U.S. 451, 460–461, 69 S.Ct. 191, 93 L.Ed. 153 (opinion of Jackson, J.). Requiring officers to wait following their announcement may well permit some persons to put their affairs in order. Nonetheless, the "refusal of admittance" requirement would not prevent the interruption of intimate activities, and the protection thus afforded is rather small. *See* United States v. Woodring, *supra.* In balancing the interests involved, this relatively small gain in privacy does not justify substantial limitations upon the otherwise proper activities of law enforcement officials. It is therefore reasonable to permit entry upon announcement only, when there is some indication of exigent circumstances.

In sum, both the case law and analysis of the policy bases of the rule of announcement support the following standards regarding "refusal of admittance" once a proper section 3109 announcement has been made: entry is permissible simultaneously with or shortly after announcement if there is a likelihood that the occupants will attempt to escape, resist, destroy evidence, or harm someone within *and* if a nonforcible entry is possible; more specific inferences of exigency are necessary if entry may be obtained only by the physical destruction of property; an explicit refusal of admittance or lapse of a significant amount of time is necessary if the officers have no facts indicating exigency.

Judged by these standards, entry upon announcement was permissible in this case. The officers did not have to force their way into the garage; the door was unlocked and they had merely to raise it. Moreover, the elements of hot pursuit, including the fact that the officers could well believe that the occupants of the garage knew of the officers' presence, made attempted flight likely. We therefore hold that the entry in this case complied with 18 U.S.C. § 3109.

Affirmed.