**UNITED STATES of America**

v.

**Walter BETHEA a/k/a "Train".**

**Crim. No. H–74–115.**

United States District Court,
D. Connecticut.

Jan. 31, 1975.

Peter C. Dorsey, U. S. Atty., Michael Hartmere, Asst. U. S. Atty., Hartford, Conn., for plaintiff. ·

Courtney B. Bourns, Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

BLUMENFELD, District Judge.

The defendant is under indictment for possession of an unregistered, sawed-off shotgun in violation of 26 U.S.C. §§ 5861(d), 5871 (1970). By this motion he seeks to suppress the use in evidence of the weapon which is the subject matter of this indictment. He contends that the gun was seized in the course of an illegally conducted search and that as it was not mentioned in the search warrant, it could not be legally seized.

### I.

At the evidentiary hearing held on the instant motion, the government presented the testimony of two Hartford police officers who were involved in the search. Detective Ronald Ciak, a seven-year veteran with the Hartford Police Department, testified that on March 12, 1974, he obtained a warrant to search for drugs in the apartment of Floreen Mc-Coy, the defendant's first cousin. At about 4 o'clock or 4:30 on the same afternoon, he and about four other officers went to the premises described in the warrant and knocked on the door of the apartment. A woman's voice, coming from just on the other side of the door, asked who was knocking. The police responded by identifying themselves and stating that they had a warrant to search the apartment. After waiting four or five seconds following this iden-tification, during which time the sound of people scuffling inside the apartment and moving away from the door could be heard, the police broke into the apartment. No axe was used to break down the door; an Officer Sullivan forced it open with his body.

Once inside, the police found Floreen McCoy, a John Shirley, and several of Ms. McCoy's children in the apartment. They thoroughly searched the apartment for the drugs described in the search warrant. They found no drugs, but while looking inside a convertible couch, they discovered and seized the sawed-off shotgun which is the subject matter of this indictment.

Officer Daniel Zielenski of the Hartford Police Department, who participated in the search, also testified at the hearing. His testimony essentially corroborated that of Officer Ciak in all important respects. He further testified that in addition to the scuffling which Officer Ciak heard during the four- or five-second period following the announcement of their identity and purpose, he heard people talking inside the apartment, but could not make out what was being said.

The defendant's case consisted of the testimony of only one individual, Ms. Floreen McCoy. Her account of the search directly contradicts that presented by Officers Ciak and Zielenski. She testified that the search took place at approximately 3 o'clock, before any of her children had arrived home from school. She and John Shirley were sitting on a couch, located approximately five feet from the front door, watching television. Suddenly, an axe broke through the front door and approximately eight police officers entered the apartment. According to Ms. McCoy, the police did not announce their identity or purpose before breaking into the apartment. There is no conflict in testimony with regard to the search following the break-in.

Having had an opportunity to listen to the testimony and to observe the demeanor of the witnesses, I accept the ac-

count of the police officers of the events of that afternoon. Significant in my determination is the corroborative impact of the officers' testimony and the failure of the defendant to produce as a witness John Shirley who, according to both accounts, was present in the apartment at the time of the break-in.

## II.

As both parties recognize, the narrow legal issue involved in the first challenge to this evidence is whether the police were justified in forcing entry into the apartment after identifying themselves and their purpose and then waiting four or five seconds during which time they could hear scuffling inside the apartment.[1]

The search warrant in this case was issued by a state court and executed by Hartford police officers. The defendant contends that state law should therefore govern the issue of what constitutes a reasonable entry. I need not decide the issue of whether state or federal law is to apply. In State v. Mariano, 152 Conn. 85, 95, 203 A.2d 305, 311 (1964), cert. denied, 380 U.S. 943, 85 S.Ct. 1025, 13 L.Ed.2d 962 (1965) the Connecticut Supreme Court held that the rule of this state is "consistent with the rule followed in the federal courts under 18 U. S.C. § 3109, which is the federal statute of general application governing the execution of search warrants." Section 3109[2] therefore provides the standard for this case whether federal or state law is deemed to apply.

This case does not involve an unannounced police entry. Thus, there is no issue presented as to whether exigent circumstances existed which could justify an unannounced police intrusion. *See* Sabbath v. United States, 391 U.S. 585,

88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Mapp, 476 F.2d 67 (2d Cir. 1973); United States v. Manning, 448 F.2d 992 (2d Cir.), cert. denied, 404 U. S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971); United States v. Ware, Cr. No. H–74–20 (D.Conn., Sept. 30, 1974).

The police knocked on the door and stated their identity and the fact that they had a warrant to search the apartment. Five seconds later they broke into the apartment after hearing scuffling inside and the movement of footsteps away from the front door. Under the terms of § 3109, then, the issue is whether they were "refused admittance" and thus justified in making a forcible entry.

The statute itself provides no guidance as to what constitutes a refusal of admittance. However, it has become clear that

"the phrase 'refused admittance' is not restricted to an affirmative refusal. Indeed it would be an unusual case coming before the courts where an occupant affirmatively 'refused admittance' or otherwise made his refusal known verbally after being given notice pursuant to § 3109."

Masiello v. United States, 115 U.S.App. D.C. 57, 58, 317 F.2d 121, 122 (1963). Thus, it has been recognized that the police may forcibly enter a dwelling following announcement once they have reasonably determined that persons inside are attempting to escape, destroy evidence, resist entry or harm someone inside. *See* United States v. Phelps, 490 F.2d 644 (9th Cir. 1974); United States

---

1. The government does not raise the issue of the defendant's standing to challenge the alleged illegal entry into his cousin's apartment and that issue is not reached.

2. 18 U.S.C. § 3109 (1970) provides:
   "The officer may break open any outer or inner door or window of a house, or any

part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

v. Bustamante-Gamez, 488 F.2d 4 (9th Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); United States v. Pratter, 465 F.2d 227, 230–232 (7th Cir. 1972); Stamps v. United States, 436 F.2d 1059 (9th Cir. 1971); United States v. Aldrete, 414 F.2d 238 (5th Cir. 1969); Masiello v. United States, *supra*; State v. Mariano, *supra*. Not surprisingly, these circumstances which justify an inference of refusal of admittance parallel those which could justify a forcible entry without prior announcement. *See* Ker v. California, *supra*, 374 U.S. at 47, 83 S.Ct. 1623 (Brennan, J., dissenting).[3] Indeed, it would be irrational to suggest that the police could be barred from making a forcible entry following an announcement under circumstances which could justify their entry had no announcement been made. Moreover, from a consideration of the policies underlying the general rule proscribing forcible entries, it becomes apparent that the police may act following an announcement upon a lesser quantum of evidence that exigent circumstances exist than where no announcement has been made.

The two basic interests served by the general proscription against forcible entries are the prevention of violence and the protection of the privacy of the individual whose home is being searched.[4] An analysis of these policies reveals that both are served fully only in the case of the unannounced entry; once an announcement has been made, the interest in preventing violence is not served by a delay in entry and the interest in privacy becomes somewhat attenuated.

In Sabbath v. United States, *supra*, 391 U.S. at 589, 88 S.Ct. at 1758, the interest in preventing violence was described in terms of safeguarding "officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there." Quite clearly this is a concern which is only relevant where the occupants of the dwelling remain ignorant of the identity of the persons making a forcible entry. Once an announcement is made, the police would no longer need fear violence at the hands of someone mistaking them for unauthorized intruders. On the contrary, once an announcement is made, the police would then be in danger of attack by an occupant intent upon resisting entry. Waiting any considerable period of time would only allow such an individual an opportunity to arm himself. Thus, if anything, the interest in preventing violence is better served following an announcement by a rapid rather than a delayed entry. *See* United States v. Bustamante-Gamez, *supra*, 488 F.2d at 11.

The privacy protected by the announcement rule has been described as being "of the essence of the substantive protections which safeguard individual liberty", Ker v. California, *supra*, 374 U.S. at 49, 83 S.Ct. at 1637 (Brennan, J., dissenting), and summarized in the

---

3. There are, of course, some differences between these two situations. For example, an unannounced entry is justified where the "persons within already know of the officers' authority and purpose." Ker v. California, *supra*, 374 U.S. at 47, 83 S.Ct. at 1636. Such a circumstance would have little application to the case of an announced entry. Similarly, the mere passage of time following an announcement has been held to give rise to an inference of refused admittance. *See* United States v. Woodring, 444 F.2d 749, 751 (9th Cir. 1971); United States v. Whiting, 311 F.2d 191, 195 (4th Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766 (1963). Clearly, that circumstance would be inapplicable where no announcement had been made.

4. In United States v. Bustamante-Gamez, *supra*, 488 F.2d at 11, the Ninth Circuit suggested that "preventing the unnecessary destruction of private property" is yet a third interest served by the rule against forcible entry. *See* Note, Announcement in Police Entries, 80 Yale L.J. 139, 154 (1970). However, in its several discussions of the policies underlying the rule, the Supreme Court has never suggested that this is an interest which must be seriously considered. *See* Sabbath v. United States, *supra*; Ker v. California, *supra*; Miller v. United States, *supra*.

adage "a man's house is his castle." Miller v. United States, 357 U.S. at 307, 78 S.Ct. at 1194. In United States v. Bustamante-Gamez, *supra*, the Ninth Circuit analyzed this privacy interest as really being of a two-fold nature. First, there is the interest in protecting "the homeowner from the outrage of having his 'castle' suddenly and violently broken into." *Id.*, 488 F.2d at 11–12. That interest, however, is served if an announcement is made and the occupant is given some opportunity to voluntarily open the door. Thus, this interest also is one whose force is substantially vitiated by the making of an announcement.

Secondly, the court noted that "the rule may prevent embarrassing circumstances resulting from the unexpected exposure of private activities." 488 F.2d at 12. This interest does remain following an announcement, but it alone cannot justify a rule which would prevent a post-announcement forcible entry except upon a clear showing of exigent circumstances.

Thus, the foregoing analysis indicates that most of the interests served by the general rule against forcible entries are satisfied merely by an announcement of identity and purpose and the granting of *some* opportunity to the occupants to open the door voluntarily. Once the announcement has been made, the police officers need not stay their hand (foot or axe, as the case may be) until there is a clear indication of refusal of admittance. They may infer such refusal from a smaller quantum of evidence than would be required to justify an unannounced entry.

In the instant case, the police inferred from the activity which they heard inside the apartment that an attempt was being made to destroy evidence and thereby constructively deny them admittance. The time period which elapsed between the announcement and the forcible entry was quite short: only four or five seconds. However, given the nature of the sounds heard from within the apartment, the experience of the police officers involved in the search, and the ease with which the object of the search could be destroyed, I find that this post-announcement forcible entry was justified.[5]

### III.

The defendant also contends that the seizure of the sawed-off shotgun was illegal, because that item was not listed in the search warrant. There is no merit to this claim. Where "the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character", Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971), they may seize such an object. Quite obviously, they may also seize any contraband which they come across under the same circumstances. *See* Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); United States v. Berry, 423 F.2d 142 (10th Cir. 1970).

In the instant case, the sawed-off shotgun came into the "plain view" of the police officers during the course of a valid search. Thus, the only question is whether the gun was an article of contraband. The possession of a sawed-off shotgun provides probable cause to believe that 26 U.S.C. § 5861(d) (1970) (making illegal the possession of an unregistered "firearm," defined in 26 U.S.C. § 5848(1) (1970) as including a shotgun with a barrel length of less than eighteen inches) had been violated. *See* United States v. Berry, *supra*; United

---

5. The court need not and does not decide whether the mere fact that drugs are the object of the search, in the absence of other indications that the evidence is being destroyed, is sufficient to justify entry contemporaneously with or immediately following the announcement. For a view that that factor alone cannot justify a forcible entry, *see* United States v. Doering, 384 F.Supp. 1307 (W.D.Mich.1974).

States v. Danesi, 342 F.Supp. 889, 892 n. 1 (D.Conn.1972); *cf.* United States v. Zeidman, 444 F.2d 1051, 1054 (7th Cir. 1971). The gun could therefore be legally seized as contraband.

The defendant's motion to suppress evidence is denied and it is so ordered.