UNITED STATES of America, Plaintiff,

v.

**Karouje TIRINKIAN, a/k/a Henry Tirinkian, Gregory J. Wentz, Trevor Davies Baird, and John Rodgers, Defendants.**

UNITED STATES of America, Plaintiff,

v.

**Karouje TIRINKIAN, a/k/a Henry Tirinkian, Gregory J. Wentz, Defendants.**

Nos. C2–80–43, C2–80–44.

United States District Court,
D. North Dakota,
Northeastern Division.

Dec. 10, 1980.

Gary Annear, Asst. U. S. Atty., Fargo, N. D., for plaintiff.

Patrick W. Fisher, Shaft, McConn, Fisher & Thune, Grand Forks, N. D., for Tirinkian.

Alan J. Larivee, Murray, Olson, Larivee & Bohlman, Grand Forks, N. D., for Wentz.

Robert A. Alphson, Grand Forks, N. D., for Baird.

R. Lee Hamilton, Grand Forks, N. D., for Rodgers.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

In the two above entitled criminal actions, defendants have been charged with, *inter alia*, violation of the federal narcotics laws, 21 U.S.C. §§ 841(a)(1) and 846. Defendants have now moved, pursuant to Fed. R.Crim.P. 41(f), to suppress certain evidence which was seized from them. Specifically, defendants Tirinkian and Wentz challenge the lawfulness of their arrest and the search incident thereto. Defendants Baird and Rodgers claim that the warrantless entry into Rodgers' dwelling was not accompanied by exigent circumstances, and was thus invalid. It is further claimed that the officers did not comply with the federal "knock and announce" statute, 18 U.S.C. § 3109, before they entered the house. All the defendants challenge the lawfulness of five search warrants which resulted in the seizure of contraband. On November 25, 1980, an evidentiary hearing was had on the motions. Again, on December 1, 1980, the parties were given the opportunity to argue their respective positions.

## I. FINDINGS OF FACT

On September 17, 1980, agents from the Drug Enforcement Agency (DEA) in this area received a call from their counterparts in Blaine, Washington, advising them that they had received information that an individual named "Hemey" or "Henry," registered in Room 118 in the Holiday Inn in Grand Forks, would be involved in a large hashish transaction. Subsequent investigation by the local DEA revealed that the person registered in the room was one Henry Tirinkian, whose name also appeared in DEA records. Investigation by agents of DEA disclosed that he had checked in on September 16, and had indicated he was planning to stay about a week but was paying for his room on a day-to-day cash basis. Further, that at the time he checked in, he was accompanied by an unidentified

male person. Investigation of the hotel phone record showed he had made several calls, including a call to Austria.

The local DEA agents learned later that the Royal Canadian Mounted Police (RCMP) was providing the information to the Blaine agents.

By September 19th local agents began a surveillance by stationing themselves in rooms adjacent to and across from Tirinkian's room. The local agents were continuously in contact with their counterparts in Blaine, and at some point it was learned that the RCMP was receiving its information through court authorized wiretaps conducted in Canada and Austria. The local agents were told of monitored conversations between Bruce Ervin of Victoria, British Columbia and Peter Newall of Salzburg, Austria, in which a sale of drugs in Grand Forks was discussed, with Mr. Newall telling Ervin that his contact would be one Henry in Room 118 of the Holiday Inn.

Around 2:00 a. m. on September 20, a male person was seen driving up to the Holiday Inn in a 1977 Datsun pickup. The person went to Tirinkian's room, stayed about an hour, and then left. A check of the vehicle registration revealed that the person was Gregory J. Wentz, now a defendant in this case. A DEA check of Wentz revealed that he was convicted of narcotic offenses in Denmark in 1974, was released from custody in 1978 and was deported from Denmark at that time.

Wentz returned to Tirinkian's room about 2:00 p. m. on that same day, left after awhile, later returned, and left again about 3:50 p. m. carrying a large grocery bag which he placed in his vehicle. He was then seen driving to Building E of the Gallery Apartments. He carried the grocery bag into the building. Shortly thereafter a man was seen walking out of Building E and towards a 1964 green Pontiac. He drove the car to the driveway area of the building where he was out of the sight of the surveillance officers. When he drove from the

area, a large box was seen in the backseat of the car, which was not seen there before. Information which the agents acquired through a check on the registration caused them to believe that the car was not being driven by the registered owner.

By this time agents had received information from the Blaine office and the RCMP [1] that Mr. Ervin's representative in the drug transaction would be one Trevor Baird who would be flying from British Columbia to Grand Forks. The agents were provided with a general physical description of Baird. They were also told that Baird would be carrying a large sum of money. The agents called the Grand Forks Airport and from the various flight schedules determined the flight he would probably be on. Surveillance of the airport was arranged.

At about 7:45 p. m. on September 20, Baird was seen deplaning from a commercial carrier at the Grand Forks airport. The fact that he matched the physical description, and was travelling alone, led the agents to believe it was Baird. Baird used the Holiday Inn courtesy van to go to the Holiday Inn. There he checked in as "T. B. Davies" and was assigned to Room 103.

Defendant Wentz had returned to Tirinkian's room about 6:00 p. m. that evening. Later, Baird was seen going to the door of Tirinkian's room. He knocked and was heard to say, "Henry, I'm Trevor Baird. I was sent by Bruce Ervin." He was admitted to the room. The three remained in the room until about 10:00 p. m. Conversations, if any, in the room were not overheard. Wentz and Baird then left in the Datsun pickup, made a couple of stops, and about 1:00 a. m. on September 21, they drove to 1105 23rd Avenue South in Grand Forks. Also parked in the driveway of the residence was the same 1964 Pontiac seen earlier at the Gallery Apartments.

It was observed that lights were on in the residence upstairs and in the basement. The agents heard the sound of a power saw,

ripping wood, and hammering, all loud enough so that it could be heard from the street. At about 3:30 a. m., Wentz left and returned. At about 5:00 a. m., Wentz and Baird drove in the Datsun to the Holiday Inn. Baird went to his room, and Wentz drove on to the Gallery Apartments.

Later in the day at about 10:00 a. m., the same unidentified individual seen at the Gallery Apartments left the residence at 1105 23rd Avenue South in the same 1964 Pontiac. At about the same time, Wentz was seen leaving the Gallery Apartments. He was observed driving his Datsun to the Holiday Inn, and going to Baird's room. Both Wentz and Baird then went to Tirinkian's room. Shortly afterwards, Wentz and Baird drove to the 1105 23rd Avenue South residence. The Datsun, which was equipped with a camper top, was backed into the driveway, and the agents observed that several large boxes and green garbage bags were loaded into the cargo area. They also observed that a gun case was placed in the cargo area. Wentz drove away and Baird went into the house.

In the meantime, officers had observed Tirinkian check out of his room at the Holiday Inn around 12:00 noon, and go into Baird's room. Wentz was seen arriving in his pickup near the outside entrance to Room 103 at about 2:15 p. m. He entered the room carrying a white cloth satchel-type bag. A short time later, both Tirinkian and Wentz emerged from the room. Wentz still carried the white bag. Tirinkian was carrying a brown suitcase and a briefcase. Both got into the Datsun pickup, and were followed to the Grand Forks Airport. When they pulled up to the curb close to the terminal, the agents blocked the pickup with their own vehicle and arrested both Tirinkian and Wentz.

On their approach to the Wentz vehicle after they made the decision to arrest, the agents detected a strong hashish odor emanating from the vehicle. Tirinkian's person was searched and approximately $26,000 in Canadian and American currency was seized from his pockets. A cursory search for weapons was made in the cab area of the pickup. None were found. Tirinkian was advised of his rights and stated that he found all but about $2,000 of the money in a motel room. The officers were in close proximity to the vehicle and could see broken pieces of inlaid wood through the windows of the camper. The DEA agent in charge, Lee Wayne Nicks, recalled something he had heard from the RCMP. In either the late evening hours of September 19, or the early morning hours of the 20th, Agent Nicks had received information that while Mr. Ervin and Mr. Newall were talking during a phone conversation, Newall was asked how the drugs were sent. In reply, Newall had said something to the effect that "if you cut it carefully, you could make a nice Chinese room." Agent Nicks had not placed importance on the conversation until he saw the broken inlaid wood in the back of the Wentz vehicle. Airport customs officials at the airport informed the DEA agents that a number of days earlier, fifteen boxes described in the packing slips as containing about 180 backgammon boards constructed of inlaid mother of pearl wood, sent by air freight from Syria, were picked up by the consignee, one John Rodgers. The broken pieces of inlaid wood visible in the Wentz vehicle were similar to the description in the packing slips. Agent Nicks was familiar with the fact that Syria is a well known outlet for drugs, and he attached significance to the fact that backgammon boards of a low declared value would be shipped by air freight.

Shortly after the arrest, Agent Nicks conferred with Agent Charles Lee of the DEA at the airport, concerning securing the residence at 1105 23rd Avenue South. Surveillance personnel had remained at the residence, and radio contact was maintained with them. They had seen the person driving the 1964 Pontiac return to the house at about 2:45 p. m. and carry some large boxes into the house. To their knowledge, Baird was also still in the house. Agent Lee arrived at the scene at about 3:15 p. m. He was told by the other officers there that they had observed someone drive up to the house, walk to the front door, knock, stand around, and knock again. There was no

response. The person then went back to his vehicle, and returned to the door with a note, stood around, and then left.

Shortly before the Tirinkian and Wentz arrest, Agent Nicks began preparing an affidavit for search warrants. He was interrupted by the sudden activity. The federal DEA agents were away from their home office and lacked secretarial help. The 21st of September was a Sunday, and the agents anticipated difficulty in finding a magistrate to whom a request for a warrant could be presented.[2] The arrest at the airport caused Agent Nicks to believe that the drug transaction had probably been completed and further that Tirinkian was probably about to leave Grand Forks. Further, Nicks was concerned that Wentz may have been expected to return to the residence after accompanying Tirinkian to the airport, and upon his failure to return, the occupants of the residence would probably be alerted and would destroy evidence.

Agents Lee and Nicks conferred by telephone at about 3:15 p. m. and Nicks, the agent in charge, gave the order to secure the house. There were about six agents in the area at the time. Agent Lee went to the rear pedestrian door leading to the attached garage, knocked on the closed door and announced his authority. After hearing no response, he opened the door. He was then joined by other agents when he approached the door leading from the garage to the house. Agent Lee knocked loudly on the inside door and announced his authority. He waited for a response and when there was none he forced the door. A stairway to the basement led from the doorway. Trevor Baird was on the stairs. At the foot of the stairs was the man linked with the 1964 Pontiac, who turned out to be John Rodgers. Both men were arrested. A strong hashish odor was noticed. The officers walked through the basement to check for the presence of other people. In open view were large quantities of hashish and

hashish oil. The two defendants were told that a search warrant was being requested. No contraband was seized at this time.

During this time, Agent Nicks was preparing the affidavit, (Defendant Wentz's Ex. 1), for the search warrants. The Canadian–Austrian drug investigation was still ongoing and Nicks had been asked by the Canadian authorities to protect the secrecy of that investigation if possible. With that objective in mind, Nicks referred to the RCMP as a confidential informant in his affidavit, as follows:

Lee Wayne Nicks, Resident Agent in Charge, Drug Enforcement Administration, Fargo, North Dakota, being first duly sworn, deposes and says:

That on September 17, 1980, he received information from [a] reliable confidential source of information. The Drug Enforcement Administration and your Affiant has received information from the above–cited source on numerous occasions. The information received has been verified in many instances in the past through independant [sic] investigations conducted by your affiant and the agents of the Drug Enforcement Administration. The information provided by the instant source has resulted in at least six convictions for drug related offenses in the last six months.

Your affiant further states that on September 17, 1980, information was received from the reliable confidential source that a large quantity of marijuana resin (Hashish) would be transferred to an unspecified recipient by a source of supply who was renting room 118 at the Holiday Inn, Grand Forks, North Dakota.

The affidavit went on to recite in detail the observations the DEA had made through its surveillance of the activities of the defendants from September 19 up to September 21. This included the arrest of Tirinkian and Wentz and mention of the

---

2. The validity of the agents' concern is supported by the subsequent chain of events. The affidavit was not completed until about 6:30 p. m. The agent was unable at that time to locate the federal magistrate. Some time after 8:30 and prior to 8:45, the agent reached North Dakota State District Judge Joel Medd at the Judge's home. The search warrants were issued at the Judge's residence at about 9:00 p. m.

evidence seized in searches incident to their arrests, including about one ounce of hashish found on Wentz's person. Agent Nicks did not refer in the affidavit to the contraband Agent Lee and the others had observed in the residence.[3] Search warrants were sought for the residence at 1105 23rd Avenue South; the 1964 Pontiac seen driven by Rodgers; the 1977 Datsun pickup owned by Wentz; Room 103 at the Holiday Inn; and Apartment 202E in the Gallery Apartments.[4] On the basis of the affidavit, Judge Medd authorized the search warrants. Agent Nicks brought the search warrant to the Rodgers residence at about 9:00 p. m. A search of the house was conducted at that time. Searches pursuant to the other warrants were conducted later, and contraband seized.

## II. ULTIMATE FINDINGS AND CONCLUSION

The court concludes that at the moment Tirinkian and Wentz were arrested, the facts and circumstances within the arresting agents knowledge based on reasonably trustworthy information were sufficient to warrant a prudent man in believing that Tirinkian and Wentz had committed an offense.

The court also concludes that there was a sufficient showing of probable cause in the affidavit presented to Judge Medd, acting as magistrate, to justify his issuance of the five search warrants.

Further, the court concludes the agents had probable cause to believe there was contraband in the Rodgers house and finds that exigent circumstances existed at the

time which justified the warrantless entry, and that in making the entry the agents complied with the federal knock and announce statute.

## III. DISCUSSION OF THE FACTS AND THE LAW

### A. Arrest of Tirinkian and Wentz[5]

█ Probable cause for a warrantless arrest hinges upon

[w]hether, at the moment the arrest was made, . . . the facts and circumstances within the [arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.

*United States v. Neumann*, 585 F.2d 355, 357 (8th Cir. 1978), quoting from *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). This assessment is at least as stringent as the standards a magistrate would apply in approving an arrest warrant. *Whiteley v. Warden*, 401 U.S. 560, 566, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971). Furthermore, in determining whether probable cause existed, the court looks "to the 'objective facts available for consideration by the agencies or officers participating in the arrest,' i. e., the collective knowledge of the arresting officers." *United States v. Neumann, supra* at 357.[6]

█ Here, the agents had received their information from the RCMP. Its reliability is not only inherent because of its status as a law enforcement agency, *cf.*

---

**3.** The only information obtained from the entry into the house which Agent Nicks utilized for the affidavit was the linking of the name John Rodgers with the person the officers had observed in the 1964 Pontiac. Although the officers had seen Rodgers and in fact had run across his name, it was not until he was arrested that the agents linked the name with the person.

**4.** The agents determined the apartment number from the assigned parking spot in which Wentz had parked his vehicle.

**5.** The issue of the arrest is important only insofar as it affects the validity of the search incident to the arrest. *See Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952); *United States v. Morris*, 445 F.2d 1233, 1235 n.1 (8th Cir. 1971), *cert. denied*, 404 U.S. 957, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971).

**6.** It was not necessary that the particular officers making the arrest have personal knowledge of all the facts and circumstances constituting probable cause. Knowledge possessed by the superior officers is imputed to them. *United States v. Regan*, 525 F.2d 1151, 1154 (8th Cir. 1975).

*Whiteley v. Warden, supra,* 401 U.S. at 568, 91 S.Ct. at 1037, *United States v. Stevens,* 509 F.2d 683, 687 n.6 (8th Cir. 1975), *cert. denied,* 421 U.S. 989, 95 S.Ct. 1993, 44 L.Ed.2d 479 (1975); *Klinger v. United States,* 409 F.2d 299, 303 (8th Cir. 1969), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969), but was also established by the fact that the local agents' surveillance corroborated much of the information they had received. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

In addition to the requirement of reliability, the information supplied by the RCMP to the local agents must be buttressed with some of the underlying circumstances as to how it obtained the information. *United States v. Wixom,* 460 F.2d 206, 208 (8th Cir. 1972). This requirement was also met. The local DEA agents were told that the RCMP was receiving its information from wiretapped telephone conversations between participants of the drug transaction.

■ The defendants, in this regard, contend that 47 U.S.C. § 605, a statute governing intercepted communications, should bar use of the wiretaps for establishing probable cause. Section 605 was amended in 1968 when Congress passed the new Crime Control Act, 18 U.S.C. § 2510 *et seq.* Wiretaps conducted by law enforcement officials are no longer governed by § 605, but rather by the new Act. *United States v. Hall,* 488 F.2d 193, 195–96 (9th Cir. 1973). The new Act, however, has no application outside the territorial jurisdiction of the United States. *Stowe v. Devoy,* 588 F.2d 336, 341 (2nd Cir. 1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979). Furthermore, it is the point of interception which governs, even if the intercepted conversations traveled in this country's communications system. *United States v. Cotroni,* 527 F.2d 708, 711 (2nd Cir. 1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976). Further, the fourth amendment exclusionary rule is not applicable to foreign search and seizures. *Stowe v. Devoy, supra. See also United States v. Rose,* 570 F.2d 1358, 1361–62 (9th

Cir. 1978). "The rationale underlying this limitation is the doubtful deterrent effect on foreign policy practices that will follow from a punitive exclusion of the evidence in question by an American court." *Stowe, supra* at 341. There are two recognized exceptions to the rule. If the circumstances of the foreign search are so extreme that they shock the judicial conscience, or if the American law enforcement agents participated in the foreign search, the exclusionary rule would be applicable. *United States v. Rose, supra* at 1362.

■ In this case, the points of interception of the wiretaps were in Canada or Austria. There is no indication that any American agent participated in the wiretaps. Furthermore, there were foreign court orders authorizing the wiretaps. This procedure does not shock the court's conscience. The court holds that the wiretap evidence is not subject to the fourth amendment exclusionary rule, or the exclusionary rule of the 1968 Crime Control Act.

■ The court holds that the facts and circumstances known to the agents at the time of the arrest of Tirinkian and Wentz, as disclosed by this court's factual findings, constituted sufficient probable cause to make the arrest at that time.

**B.** *Warrantless Entry into Rodgers' House*

■ In the instant case, the agents had no warrant when they entered Rodgers' home to secure it. The fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home absent exigent circumstances. *United States v. Houle,* 603 F.2d 1297, 1299 (8th Cir. 1979). *See also Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Williams,* 633 F.2d 742 (8th Cir. 1980). An objective standard is used to measure the reasonableness of the agents' belief in the existence of exigent circumstances. *See Root v. Gauper,* 438 F.2d 361, 364 (8th Cir. 1971).

The Eighth Circuit has suggested certain factors to be used in determining whether exigent circumstances exist to make a warrantless entry into a private dwelling. The criteria are as follows:

1) that a grave offense is involved;

2) that the suspect is reasonably believed to be armed;

3) that a clear showing of probable cause exists to believe the suspect committed the crime in question;

4) that there is strong reason to believe the suspect is in the premises being entered;

5) that a likelihood exists that the suspect will escape if not swiftly apprehended; and

6) that the entry, though not consented to, is made peaceably.

*United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir. 1978).

■■■ Applying these factors to the instant case, it would appear that the only one not clearly present is the reasonable belief that Rodgers or Baird was armed or violent.[7] Illegal distribution of drugs contrary to federal law is a grave offense. *Kulcsar, supra* at 1287.

Furthermore, there was a clear showing of probable cause that evidence of contraband would be found in the residence. Before Wentz was arrested, he was seen loading boxes into his truck at the Rodgers' residence. At the time Wentz was arrested, the agents recognized the boxes as being similar to ones shipped from Syria to John Rodgers, said to contain backgammon games. This, in turn, was connected with the wiretapped conversation in which it was mentioned how the drugs were being imported. This also was connected with the sawing and hammering heard at the Rodgers' house the night before. Furthermore, Baird had been determined to be the representative of one of the principals of the drug deal. He was seen at the residence on more than one occasion and was known to be in the house at the time of the entry. Also, the same 1964 Pontiac seen at the Gallery Apartments when Wentz was there, was parked at the residence. All these facts gave the officers strong probable cause to believe that the house contained contraband and that at least two persons believed to be in the house were implicated in the drug scheme.

When the agents entered, they had strong reason to believe Baird and Rodgers were in the house. The house had been under constant surveillance. Baird and Rodgers had been observed entering the house but had not left after their last entry.

It is established that "[t]he presence of evidence reasonably believed to be in imminent danger of removal or destruction is well recognized as a circumstance which may permit immediate police action." *Kulcsar, supra* at 1287. Several factors justified the swift action taken. When Wentz was arrested at 2:30 p. m., there was reason to believe he may have been expected to return to the Rodgers house. Furthermore, the fact that it appeared Tirinkian was about to board a plane to leave the area, indicated the anticipated drug deal was likely completed. From this point, events could move quickly. In addition, there was difficulty in preparing the affidavit and locating a magistrate. Had the agents waited until they obtained a warrant, the absence of Wentz could have caused Baird and Rodgers to become suspicious. Also, the agents had observed a person knocking at the front door and receiving no answer, even though the agents knew that Baird and Rodgers were in the house. The agents were experienced agents who knew that drugs could be easily destroyed and probably would be if the occupants became suspicious. Moreover, the agents knocked at the door and announced their authority, and did not enter until after they had received no response.[8] In this regard, the court in *Kulcsar* stated as follows:

> that the occupants of the residence may have been armed.

---

7. The observation of a gun case being taken from the residence and placed in Wentz's pickup shortly before he left to pick up Tirinkian would have alerted the agents to a probability

8. See discussion in Subsection C, *infra*.

In addition, their efforts to obtain a response by knocking and announcing their authority not only demonstrated good faith, but provided statutory authority to enter. 18 U.S.C. § 3109. We have previously held that a suspect's failure to respond to such announcement may contribute to a finding of exigency justifying a warrantless entry.

*Id.* at 1288. Additionally, although agents forced the door leading to the kitchen, this would still constitute a peaceable entry. *Kulcsar, supra.*

The court holds that there were exigent circumstances justifying the warrantless entry into Rodgers' dwelling.

### C. Knock and Announce Issue

Defendant Rodgers claims that the agents failed to knock and announce their authority before entering his house. The governing federal statute, 18 U.S.C. § 3109 provides as follows:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

These requirements apply to warrantless entries and to the simple opening of an unlocked door. *Sabbath v. United States,* 391 U.S. 585, 588 and 590, 88 S.Ct. 1755, 1757 and 1758, 20 L.Ed.2d 828 (1968). Failure to comply with the statute results in the suppression of evidence connected with the entry. *Id.*

The court has found that Agent Lee knocked and announced his authority and waited for a response before entering the rear garage door. The court has also found that the agents knocked, announced their authority, and waited for a response before forcing the door leading from the garage to the house.[9]

Defendant Rodgers offered evidence to show that the front pedestrian door to the garage was broken sometime after 12:30 a. m. on September 21, and that the rear pedestrian door was locked. An acceptance of this version would impeach the credibility of Agent Lee, an experienced drug enforcement officer who in many other appearances before this court has shown himself to be a credible witness. There is a distinct probability that the front pedestrian garage door was broken by an agent other than Lee but there is no evidence as to who broke it. Assuming *arguendo* that one of the agents broke the door down without announcing his authority while Agent Lee entered the back door, there would still be adequate compliance with the statute. "[O]fficers are not required to announce at every place of entry; one proper announcement under section 3109 is sufficient." *United States v. Bustamante–Gamez,* 488 F.2d 4, 10 (9th Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). Thus, an unannounced entry through the rear door of a residence has been approved when it was made a few seconds after a properly announced entry through the front door. *Id.,* citing *Cognetta v. United States,* 313 F.2d 870 (9th Cir. 1963). Here, Agent Lee followed the proper procedure at the rear door, so that a simultaneous improper entry through the front garage door would not vitiate the entry. The court in *Bustamante–Gamez* did indicate that there may be instances where the officer's choice of place to announce would be so unreasonable that a second announcement would be required at the other point of entry. *Id.* at 10. Such is not the case here. Agent Lee was justified in going to the rear garage door since the agents had already observed someone knocking at the front door and receiving no response.

In conclusion, the court holds that there was adequate compliance with § 3109 when the officers entered the house.

---

9. A failure to receive a response to a knock when one should be reasonably expected is the same as being refused admittance for purposes of the statute. *United States v. Kulcsar, supra* at 1286.

### D. *Validity of the Affidavit in Support of Search Warrants*

■ In his affidavit for search warrants, Agent Nicks treated the RCMP as a confidential informant. Even though the DEA knew who the informer was, this was not set out in the affidavit. It is elementary that in passing on the validity of a warrant, the court may consider *only* information brought to the magistrate's attention. *Aquilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 1511 n.1, 12 L.Ed.2d 723 (1964).

■ In order to be valid, an affidavit which relies upon information from an unnamed informant must meet the so-called two prongs of the *Aquilar–Spinelli* test. It must show some of the underlying circumstances upon which the informant based his conclusion (basis of knowledge prong), and it must show some of the underlying circumstances showing the informant to be credible or reliable (veracity prong). *Aquilar v. Texas, supra* at 114, 84 S.Ct. at 1514. In the instant case, the basis of knowledge prong is clearly deficient. The affidavit only states that the informant reported that a large quantity of marijuana resin would be transferred to an unspecified recipient by a source of supply who was renting Room 118 at the Holiday Inn in Grand Forks. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that a drug transaction would occur. *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). The magistrate was not told how the source came by the information. *Id.* Furthermore, the deficiency is not cured by any particular detail, *id.; see Draper v. United States, supra,* which would imply that the informant was relying on something more than casual rumor or general reputation.

■ Therefore, it is clear that the informant's tip, standing alone, does not meet the *Aquilar* test. Furthermore, the tip is not sufficiently detailed that it could be corroborated so as to be reliable as one which would pass *Aquilar's* requirements when standing alone. *Spinelli v. United States, supra* at 415–16, 89 S.Ct. at 588–89. But the analysis does not end here. Even if the tip is insufficient, facts obtained from any independent police investigation considered with the tip may meet the threshhold requirements of probable cause. *Id.* at 418, 89 S.Ct. at 590; *United States v. Scott,* 545 F.2d 38, 40 (8th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).[10]

■ In the instant case, the affidavit sets forth the observations from the surveillance, including the different meetings between defendants at the various locations. It set forth the drug related background of Wentz and Tirinkian. It linked the hashish odored boxes in the rear of the Wentz vehicle with ones shipped from Syria to John Rodgers. The broken pieces of wood in the vehicle matched the description of the packing slips. The affidavit reported the sawing and hammering sounds from Rodgers' house in the early morning hours. It revealed the fact that a large sum of money was found on Tirinkian and that a small amount of hashish and wood chip residue was found on Wentz. Unlike the case in *Spinelli,* here the observations of the agents reported in the affidavit, are "endowed with an aura of suspicion by virtue of the informer's tip." *Spinelli, supra,* 393 U.S. at 418, 89 S.Ct. at 590. Here, the reported activities do "permit the suspicions engendered by the informant's report to ripen

---

10. Defendants contend that when Agent Nicks failed to disclose that his confidential source was the RCMP, he made a deliberate misstatement to the magistrate. In *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Court held that if the affiant intentionally or recklessly includes a false statement in a warrant affidavit, and if, with the false material set aside, the remaining content is insufficient to establish probable cause, the search warrant must be voided. In the instant case, the court does not view Agent Nicks to have made a material false statement. What he placed in the affidavit was true and by failing to disclose his source, he did not enhance his position, but in all probability placed himself at a disadvantage. Therefore, the court holds that it may consider the tip with all the other matter in the affidavit.

into a judgment that a crime was probably being committed. *Id.*

 The court concludes that the affidavit as a whole supplied a sufficient basis for Judge Medd's finding of probable cause to issue the five search warrants.[11]

IT IS ORDERED that defendant Tirinkian's motion to suppress evidence in C2–80–43 and C2–80–44 is denied.

IT IS FURTHER ORDERED that defendant Wentz's motion to suppress evidence in C2–80–43 and C2–80–44 is denied.

IT IS FURTHER ORDERED that defendant Baird's motion to suppress evidence in C2–80–43 is denied.

IT IS FURTHER ORDERED that defendant Rodgers' motion to suppress evidence in C2–80–43 is denied.

---

11. The court on request of defendant Tirinkian has read and takes judicial notice of the transcribed testimony of Agent Nicks before the grand jury and finds it to be not materially inconsistent with the contents of the affidavit, or his testimony at the hearing before this court.